1  Michael D. Harris, Cal. Bar No. 59,470
2  mharris@socalip.com
   Marina Lang, Cal Bar No. 251,087
3  mlang@socalip.com
4  SoCal IP Law Group LLP
   310 N. Westlake Blvd., Suite 120
5  Westlake Village, CA 91362-3788
6  Phone: (805) 230-1350 • Fax: (805) 230-1355

7  Attorneys for plaintiff Move Press, LLC

8                    **UNITED STATES DISTRICT COURT**

9        **CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION**

| | |
|---|---|
| 10  Move Press, LLC | No. 2:18-cv-01686-JAK-RAO |
| 11      plaintiff, | Plaintiff Move Press's Memorandum of |
|         v. | Points and Authorities for Summary Judg- |
| 12  Peloton Interactive, Inc., | ment on Trademark Infringement and Related |
| 13      Defendant. | Claims |
| 14 | Date:    March 4, 2019 |
| 15  And Related Counterclaims | Time:    8:30 a.m. |
| | Judge:  Kronstadt |

16

17

18

19

20

21

22

23

24

25

26

27

28

---

# TABLE OF CONTENTS

## Contents

A.  Introduction ..................................................................................................1

B.  Background....................................................................................................2

    1.  The parties and their businesses.................................................................2

    2.  Move Press owns the PELOTON trademark............................................4

    3.  The Pleadings............................................................................................7

    4.  The Parties' Trademark Registrations. ......................................................7

    5.  Summary Judgment is proper because there are no material factual issues and Move Press is entitled to judgment as a matter of law...................8

    6.  Trademark Infringement ..........................................................................10

        a.  All eight *Sleekcraft* factors favor summary judgment of infringement..11

        b.  Summary judgment is proper here because Peloton Interactive has no material facts disputing Move Press's ownership of the PELOTON mark, and all eight *Sleekcraft* factors support likelihood of confusion..22

        c.  Confusion harms Move Press. ................................................................22

C.  Injunctive Relief is an Appropriate Remedy ..........................................23

# TABLE OF AUTHORITIES

## Cases

*Adray v. Adry-Mart, Inc.*, 76 F.3d 984, 988 (9th Cir. 1995). ............................... 12, 23

*Am. Int'l Grp., Inc. v. Am. Int'l Bank*, 926 F.2d 829 (9th Cir. 1991) ....................... 14

*Am. Petrofina, Inc. v. Petrofina of Cal., Inc.*, 596 F.2d 896 (9th Cir. 1979) ............. 5

*Am. Scientific Chem. v. Am. Hosp. Supply*, 690 F.2d 791 (9th Cir. 1982) ............... 12

*AMF, Inc. v. Sleekcraft Boats*, 599 F.2d 341 (9th Cir. 1979) ........ 1, 11, 12, 13, 19, 21

*Anhing Corp, v. Thuan Phong Co., No. CV 13-05167 BRO (MANx),* 2015
U.S. Dist. LEXIS 97019, 2015 WL 4517846 (C.D. Cal. July 24, 2015*)* .......... 24

*Au-Tomotive Gold, Inc. v. Volkswagen of Am., Inc.*, 457 F.3d 1062 (9th Cir.
2006) ................................................................................................ 1, 2, 11

*Audi AG v. D'Amato*, 469 F.3d 534 (6th Cir. 2006) .................................... 24

*B & B Hardware, Inc. v. Hargis Indus., Inc.*, 135 S. Ct. 1293 (2015) ..................... 10

*Brookfield Communs., Inc. v. West Coast Entm't Corp., Inc.*, 174 F.3d 1036,
1047, 1053 (9th Cir. 1999).................................... 11, 12, 14, 17, 18, 23

*Cal. Cooler v. Loretto Winery, Ltd.*, 774 F.2d 1451 (9th Cir. 1985) .......................... 7

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ........................................ 8, 9

*Century 21 Real Estate Corp. v. Sandlin*, 846 F.2d 1175 (9th Cir. 1988) ...... 9, 12, 13

*Charles Schwab & Co. v. Hibernia Bank*, 665 F. Supp. 800 (N.D. Cal. 1987)
........................................................................................................ 20

*Cleary v. News Corp.*, 30 F.3d 1255 (9th Cir. 1994) .................................... 9

*Coca-Cola Co. v. Overland, Inc.*, 692 F.2d 1250, 1256 n.16 (9th Cir. 1982) .......... 10

*Commc'ns Satellite Corp. v. Comcet, Inc.*, 429 F.2d 1245 (4th Cir. 1970) ............. 13

*Conversive, Inc. v. Conversagent, Inc.*, 433 F. Supp. 2d 1079 (C.D. Cal.
2006) ............................................................................................ 22

*CytoSport, Inc. v. Vital Pharm., Inc.*, 617 F. Supp. 2d 1051 (E.D. Cal. 2009) ......... 24

*Dr. Seuss Enters., L.P. v. Penguin Books USA, Inc.*, 109 F.3d 1394 (9th Cir.
1997) ............................................................................................ 10

*Dreamwerks*, 142 F.3d (9th Cir. 1998) .................................... 10, 12, 14, 20

*Dresser Indus. v. Heraeus Engelhard Vacuum, Inc.*, 395 F.2d 457 (3d Cir.
1968) ............................................................................................ 19

*Earthquake Sound Corp. v. Bumper Indus., No. 98-17160*, 1999 U.S. App. LEXIS 19968, (9th Cir. Aug. 18, 1999) ...................................................... 11, 22

*Entrepreneur Media v. Smith*, 279 F.3d 1135 (9th Cir. 2002) ............................ 21, 22

*Esquire, Inc. v. Maira*, 101 F. Supp. 398 (M.D. Pa. 1951) ................................. 15, 16

*Friend v. H. A. Friend & Co.*, 416 F.2d 526 (9th Cir. 1969) ...................................... 5

*GoLight, Inc. v. Wal-Mart Stores, Inc.*, 355 F.3d 1327 (Fed. Cir. 2004) ................. 17

*Grey v. Campbell Soup Co.*, 650 F. Supp. 1166 (C.D. Cal. 1986)(a) .................... 5, 7

*Halicki Films, LLC v. Sanderson Sales & Mktg.*, 547 F.3d 1213 (9th Cir. 2008) ............................................................................................................... 13

*Hanson v. Triangle Pub'l, Inc.*, 163 F.2d 74 (8th Cir. 1947) ................................... 14

*Herb Reed Enters., LLC v. Fla. Entm't Mgmt.*, 736 F.3d 1239 (9th Cir. 2013) .......................................................................................................... 22-23

*Inc. v. MercExchange, LLC*, 547 U.S. 388 (2006) ................................................... 23

*Internet Specialties W., Inc. v. Milon-DiGiorgio Enters., Inc.*, 559 F.3d 985, 993 n.5 (9th Cir. 2009) ...................................................................................... 24

*Int'l Oddities v. Scott Record, No. CV 12-3934-CAS* (VBKx), 2013 U.S. Dist. LEXIS 103847, 2013 WL 3864050 (C.D. Cal. July 22, 2013) ............ 9, 11

*Jada Toys, Inc. v. Mattel, Inc.*, 518 F.3d 628 (9th Cir. 2007) ..................................... 9

*Kiki Undies Corp. v. Promenade Hosiery Mills, Inc.*, 411 F.2d 1097 (2d Cir. 1969) .............................................................................................................. 21

*Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867 (2d Cir. 1986) .......................................................................................................... 19, 20

*Marketquest Grp., Inc. v. BIC Corp.*, 862 F.3d 927 (9th Cir. 2017) ....... 10, 11, 20, 21

*McGregor-Doniger Inc. v. Drizzle Inc.*, 599 F.2d 1126 (2d Cir. 1979) ................... 20

*Network Automation, Inc. v. Advanced Sys. Concepts*, 638 F.3d 1137 (9th Cir. 2011) ................................................................ 12

*Nissan Motor Co. v. Nissan Computer Corp.*, 378 F.3d 1002 (9th Cir. 2004) ......... 11

*One Indus., LLC v. Jim O'Neal Distrib., Inc.*, 578 F.3d 1154 (9th Cir. 2009) .......... 4

*Philip Morris USA Inc. v. Liu*, 489 F. Supp. 2d 1119 (C.D. Cal. 2007) .................. 17

*Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118 (9th Cir. 2014) .......................... 12

*Rearden LLC v. Rearden Commerce, Inc.*, 683 F.3d 1190 (9th Cir. 2012) .... 4, 10, 13

*Stone Creek*, 875 F.3d (9th Cir. 2017) ................................................... 22

*Stuhlbarg Int'l Sales Co. v. D. Brush & Co.*, 240 F.3d 832 (9th Cir. 2001) ............. 23

*Triangle Pub'l, Inc. v. Rohrlich*, 167 F.2d 969 (2nd Cir. 1948) .............................. 14

*World Carpets, Inc. v. Dick Littrell's New World Carpets*, 438 F.2d 482 (5th Cir. 1971) ................................................................ 19

## Statutes

15 U.S.C. § 1095 ................................................................... 7

15 U.S.C. § 1114 ................................................................... 7

15 U.S.C. § 1119–20 to ....................................................... 7, 10

15 U.S.C. § 1125 ................................................................. 5, 7

Cal. Bus. & Prof. Code, §§ 17200 et seq ................................. 7

Cal. Bus. & Prof. Code, §§ 17500 et seq. ............................... 7

## Other

Fed. R. Civ. P. 56 ................................................................ 8, 9

## MEMORANDUM OF POINTS AND AUTHORITIES

### A. INTRODUCTION

There is no triable issue of fact regarding plaintiff Move Press's ownership of the mark PELOTON. Move Press first used the mark PELOTON on goods and services in national commerce at least four years prior to the defendant's first use. Move Press's ownership of PELOTON is irrebuttable. Nor can the defendant challenge the undisputed evidence establishing there is likelihood of confusion among consumers as to origin or source of goods or services bearing the mark PELOTON. Move Press offers undisputed evidence of actual reverse confusion, showing that its consumers believe they are associated with the defendant. Move Press also offers evidence of the defendant's concession that consumers are likely to be confused or misled. A letter sent by defendant's attorney just last month demanded that a "digital news company" cease and desist all use of PELOTON as likely to confuse and mislead consumers. This was an admission by Peloton Interactive that third-parties using PELOTON for the same goods and services offered by plaintiff Move Press are likely to cause confusion. Notwithstanding the above, all eight likelihood-of-confusion factors from *AMF, Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-49 (9th Cir. 1979) weigh in the favor of the plaintiff. "Where, as here, the evidence is clear and tilts heavily in favor of a likelihood of confusion, we have not hesitated to affirm summary judgment on this point." *Au-Tomotive Gold, Inc. v. Volkswagen of Am., Inc*., 457 F.3d 1062, 1075 (9th Cir. 2006).

Peloton Interactive attempts to stop others from using PELOTON also is an admission that Peloton Interactive itself is likely to cause confusion with Move Press. Shane Miller has an online publication "Digital Peloton News." Peloton Interactive's attorney wrote Miller complaining his news, "relat[es] to fitness equipment and fitness technology, including bicycle fitness equipment." "Peloton [Interactive] is concerned that consumers will mistakenly believe that your web series is affiliated or associated with Peloton." The attorneys gave Miller ten days to "cease use of the title 'Digital

Peloton News.'" Miller Decl. Ex. 51-52. But Move Press also has web series related to fitness equipment and bicycle technology. The attorney's letter admits Peloton Interactive is likely to cause confusion with Move Press.

## B.  BACKGROUND

### 1.  The parties and their businesses.

Move Press uses the mark PELOTON on an online digital publication and a related high-quality printed magazine Roe Decl. at 2; Exhibits are Bates 7370, 6536, 7953, 7812, 8118 Since its start in 2010, Roe Decl. ¶ 4 and Exhibits are 15967-15968, PELOTON features high-quality photography of scenic cycling routes, interviews with athletes, articles on bicycles, cycling products, general fitness, nutrition, wine and travel. *Id*. PELOTON Magazine also contains articles on stationary (spin) bikes. Roe Decl. ¶ 2, Ex. 1-6, 7 Move Press is much more than a print magazine publisher. Roe Decl. ¶ 3. It uses PELOTON in connection with an interactive website *Id*. Ex. 8; a digital blog *Id*. Ex. 9; short films *Id*. Ex. 10 and an online boutique *Id*. Ex. 11. Move Press sells clothing, jerseys, bags, footwear, hats, coffee, drinking containers, and similar goods since 2011 *Id*. Ex. 12. Move Press also utilizes its PELOTON brand in connection with product giveaways *Id*. Ex. 13. Move Press also utilizes its PELOTON brand in connection with charity rides. Roe Decl. ¶ 3.

As early as 2010, Move Press was utilizing the PELOTON brand as a media organization offering print and digital magazines, documentary films and an interactive digitally content-rich website. Roe Decl. ¶ 4; Ex. 14. Move Press has offered PELOTON Android and iTunes applications since 2012 *Id*. Ex. 15. Move Press has had a robust online social media presence for its PELOTON brand since 2012 on Facebook, Twitter, and Instagram. *Id*. Ex. 15.

Since 2010, Move Press has incurred at least $10 million in outgoing costs and expenses to develop, promote and advertise its PELOTON brand. Roe Decl. ¶ 5. $10 million includes all start-up costs and all outbound advertising costs for Move Press's PELOTON brand for the last eight (8) years. Roe Decl. ¶ 5.

John Foley is Peloton Interactive's CEO and one of its founders. He is an outdoor cyclist and triathlete. Ex. 31 to Lang Decl. ¶ 9. He worked for Barnes and Noble as president of e-commerce from 2010 to 2012. Ex. 30 to Lang Decl. ¶ 9. Foley admits he knew about Move Press's use and registration of PELOTON at least as early as 2012 after his mom told him Ex. 32 to Lang Decl. ¶ 9; Ex. 33 to Lang Decl. ¶ 9; Bates Numbers PELOTON00058115, PELOTON00058116, and PELOTON00063769-PELOTON00063771 (attached to Lang Decl. at ¶ 14 ) are emails produced by the Defendant discussing knowledge of Move Press's PELOTON magazine and its trademark registrations in 2012.

Despite knowledge of Move Press's PELOTON, Foley selected the identical mark PELOTON to use for his start-up company's goods and services. Foley testified that after he received a cessation demand from Move Press in 2014, he would not stop using PELOTON. Ex. 36 to Lang Decl. ¶ 9. Peloton Interactive claims it sold its first PELOTON-branded stationary spinning bikes in early 2014, four years after the plaintiff first sold its PELOTON goods and services. Lang Decl. ¶ 3, Peloton Interactive's trademark registration, and at least two years after it learned about plaintiff's PELOTON magazine. Ex. 32 to Lang Decl. ¶ 9; Ex. 33 to Lang Decl. ¶ 9; Bates Numbers PELOTON00058115, PELOTON00058116, and PELOTON00063769- PELOTON00063771 (attached to Lang Decl. at ¶ 14 ) are emails produced by the Defendant discussing knowledge of Move Press's PELOTON magazine and its trademark registrations in 2012.Foley admits he never considered Move Press or their trademark rights as a threat to his plans. Ex. 42to Lang Decl. ¶ 9. Foley considered Move Press's advertising expenditures as "de mimimus." Ex. 40 to Lang Decl. ¶ 9. Foley admits they plan to use the brand PELOTON in the future with "full force." Ex. 43 to Lang Decl. ¶ 9. Thomas Cortese, a co-founder of the defendant, confirms the defendant knew about Move Press's PELOTON magazine at least as early as 2012. Ex. 47 to Lang Decl. ¶ 9.

An article in the Wall Street Journal in 2018, stated that Interactive has one million subscribers, and has 70 retail showrooms across the U.S., the U.K. and Canada. Roe Decl. para. 10; Ex.17. It also advertises on TV. Ex. 45 to Lang Decl. ¶ 11, the Internet Ex. 45 to Lang Decl. ¶ 11, social media (cite to Roe's confusion evidence), online blogs (Ex. 41 to Lang Decl. ¶ 9); direct mail, (Ex. 46 to Lang Decl. ¶ 11), and through retail store-fronts (Cortese: Pg:255 Ln: 21-25 - Pg: 257 Ln:1-17). Foley admits that the defendant targeted outdoor cyclists, same as plaintiff Move Press, and now is targeting everyone. Ex. 38 to Lang Decl. ¶ 9. Foley admits that the company creates films, advertises through social media, has a phone app, streams videos, and sells clothing, same as Move Press. Ex. 37 to Lang Decl. ¶ 9. The defendant also admits it will likely spend hundreds of thousands of dollars bidding on the Adword "Peloton" by year's end.

Defendant is also advertised in high-circulation newspapers like the Wall Street Journal, (Roe Decl. para. 10; Ex.17). Foley testified that though they advertise in magazines and they contract with outdoor cyclists to make their videos, he doesn't know why they didn't advertise with Move Press. Ex. 39 to Lang Decl. ¶ 9). Foley admits they plan to use the brand PELOTON in the future with "full force." Ex. 43 to Lang Decl. ¶ 9. Foley admits the company is now targeting everyone as potential consumers. Ex. 36 to Lang Decl. ¶ 9.
The defendant has thus flooded the market with widespread advertising making it more likely consumers will be confused as to the source of goods and services used in connection with the mark PELOTON.

### 2.   Move Press owns the PELOTON trademark.

"It is a cardinal principle of federal trademark law that the party who uses the mark first gets priority." *One Indus., LLC v. Jim O'Neal Distrib., Inc*., 578 F.3d 1154, 1158 (9th Cir. 2009). "[T]he party claiming ownership must have been the first to actually use the mark in the sale of goods or services." *Rearden LLC v. Rearden Commerce, Inc*., 683 F.3d 1190, 1203 (9th Cir. 2012) (internal citations omitted).

Therefore, a later user is not its owner. *Am. Petrofina, Inc. v. Petrofina of Cal., Inc.*, 596 F.2d 896, 897 (9th Cir. 1979) (under California common law and statutes [Cal. Bus. & Prof. Code § 14400], whosoever first adopts and uses a trade name is its original owner); *see also Friend v. H. A. Friend & Co.*, 416 F.2d 526, 532 (9th Cir. 1969) ("[A] trademark is not acquired by registration. The right to a trademark stems from prior appropriation and use.") (internal quotation marks omitted). Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), governs common law trademarks too. 1 Thomas J. McCarty, MᴄCᴀʀᴛʜʏ ᴏɴ Tʀᴀᴅᴇᴍᴀʀᴋs ᴀɴᴅ Uɴꜰᴀɪʀ Cᴏᴍᴘᴇᴛɪᴛɪᴏɴ § 1:19.50 (5th ed.) (MᴄCᴀʀᴛʜʏ); *Grey v. Campbell Soup Co.*, 650 F. Supp. 1166, 1173 (C.D. Cal. 1986) ("The tests for infringement of a federally registered mark under § 32(1), 15 U.S.C. § 1114(1), infringement of a common law trademark, unfair competition under § 43(a), 15 U.S.C. § 1125(a), and common law unfair competition involving trademarks are the same.") (quoted in *Silberstein v. Fox Entm't Grp., Inc.*, No. 16-55318, 732 Fed. App'x. 517, 519, 2018 U.S. App. LEXIS 10447, 2018 WL 1940050 (9th Cir., Nov. 9, 2017). Peloton Interactive's federal applications or registration do not change the fact that Move Press is the first user and, therefore, the owner of the mark PELOTON because the registrations do not "wipe[] out the prior non-registered, common law rights of" Move Press. 5 MᴄCᴀʀᴛʜʏ § 26:53. Because it had a national presence from the beginning, Move Press need not show that its use of PELOTON had secondary meaning in specific territories. *Adray v. Adry-Mart, Inc.*, 76 F.3d 984, 988 (9th Cir. 1995).[1]

Move Press's PELOTON brand had online national recognition by consumers since its inception. Roe Decl. ¶ 6. For the period of 2012 to 2018, Move Press had at least 1 billion impressions, which is the total number of times that online consumers saw Move Press's PELOTON social media-content, and, during this same time period, 13.1 million individuals engaged with Move Press's PELOTON brand online, which

---

[1] Assuming arguendo that PELOTON is suggestive

means that 13.1 million individual people clicked through and interacted with Move Press's PELOTON social-content Roe Decl. ¶ 6.

Move Press's PELOTON brand had physical national recognition by consumers since early 2011. Roe Decl. ¶ 7. The first issue of the PELOTON magazine was distributed and sold in Barnes & Noble stores in early 2011 and by mid-2011, Move Press's PELOTON magazine was available for purchase in the nation-wide supermarket chains of Safeway, Vons and Pavilions and Kroger locations. Roe Decl. ¶ 7. By the end of 2011, 25,000 print copies of PELOTON had been distributed nationwide and PELOTON had 15,000 digital subscribers Roe Decl. ¶ 7. In 2018, approximately 12,000 PELOTON printed issues were distributed nationally; Move Press had 7,000 PELOTON subscribers; and 48,000 free copies of the digital magazine were distributed. Since inception, 90% of Move Press's subscribers are located within the United States. Roe Decl. ¶ 7.

The PELOTON magazine has many different types of subscribers for many different types of goods and services. Roe Decl. ¶ 15. Since 2011, PELOTON advertisers include without limitation businesses that sell clothing, shoes, accessories, GPS devices, heart monitors, spin bikes, food, indoor cycling trainers, computers, software, bike accessories, bike parts, and similar goods since 2011. Roe Decl. ¶ 15; Ex. 21. As discussed above, PELOTON Magazine is more than just a publisher and uses PELOTON in connection with an interactive website, blog, films, and an online boutique that has sold clothing, jerseys, bags, footwear, hats, coffee, drinking containers, and similar goods since 2011 Roe Decl. ¶ 3 Exhibits 8-13.

By November 2014, when defendant claims it sold bikes, Move Press had about 5,000 subscribers of PELOTON in print versions and about 35,000 subscribers to its digital PELOTON. Roe Decl. ¶ 16. It also had 100,000 users and 260,000 impressions to its website in 2014 Roe Decl. ¶ 7. PELOTON magazine print subscribers were throughout the United States including New York City, defendant's headquarters. Roe Decl. ¶ 9. With Move Press actively promoting PELOTON on the Internet, persons in

every state would have been exposed to its PELOTON. *Id.*[2]

Discussed at length above, Foley and his team admit they knew about Move Press's PELOTON mark as early as 2012. Foley considered Move Press's advertising to be de minimus. Foley admits he never considered changing the defendant's brand because of knowledge of Move Press or their use of the mark PELOTON. It is also undisputed that Foley worked as President of e-Commerce at Barnes and Noble when Move Press launched its first PELOTON magazine issue. It is undisputed that the defendant will not stop use of the PELOTON mark on its goods and services.

### 3.   The Pleadings

The First Amended Complaint (Dkt. 18) alleges federal trademark infringement (15 U.S.C. § 1114), unfair competition under 15 U.S.C. § 1125(a), California unfair competition law under Cal. Bus. & Prof. Code, §§ 17200 et seq, California false advertising law under Cal. Bus. & Prof. Code, §§ 17500 et seq., and cancellation of the defendant's infringing trademark applications and registrations under 15 U.S.C. §§ 1119–20. Peloton Interactive counterclaimed (Dkt. 19) for declaratory judgment of invalidity of Move Press's registration and for non-infringement and validity of Peloton Interactive's trademarks.

### 4.   The Parties' Trademark Registrations.

Plaintiff has two registrations for PELOTON. Its first application filed September 7, 2010, issued July 19, 2011, as Registration No. 3,999,969. Lang Decl. ¶ 2; Ex. 25. The attorney prosecuting the application moved it to the PTO's Supplemental Register after an office action. Lang Decl. ¶ 2; Ex. 25. But a supplemental registration "shall not constitute an admission that the mark has not acquired distinctiveness," 15 U.S.C. § 1095; s*ee also Cal. Cooler v. Loretto Winery, Ltd.*, 774 F.2d 1451, 1454 (9th Cir. 1985) (holding such an admission would improperly give the party "fewer rights than it would have had if it had not sought registration at all."). Section B.6.a.4)

---

[2] Move Press was already selling magazines in New York when Peloton Interactive began using the PELOTON trademark.

establishes evidence of actual confusion, "an indicium of secondary meaning." <u>Adray,</u> <u>76 F.3d at 987</u>. Upon discovering its registration was on the Supplemental Register, Move Press filed for registration on the Principal Register on August 14, 2014. On October 27, 2015, the PTO granted Registration No. 4,839,443 on the Principal Register. Lang Decl. ¶ 3; Ex. 26. Peloton Interactive filed no opposition.

Defendant Peloton Interactive filed an intent-to-use application for PELOTON on November 8, 2012, Application No. 85775447, which issued as Registration No. 4,580,888 on August 5, 2014, for: (1) Class 9 [namely, computer software individuals use to monitor their physical activity while they exercise], alleging its first use in commerce on April 25, 2014; (2) Class 28 [stationary exercise bicycles with computer and other components], alleging its first use in commerce on January 22, 2014; (3) Class 38 [online streaming of audio and video regarding fitness instruction], alleging its first use in commerce on May 13, 2014; and (4) Class 41 [exercise facilities and classes], alleging its first use in commerce on May 1, 2014 See Ex. 26 (Reg. Certificate).

Peloton Interactive's next application filed April 3, 2015, issued May 9, 2017, as Registration No. 5,200,495. Ex. 28. The goods include wristbands, sport bags, and sports apparel. Its third application, filed September 2, 2015, issued May 16, 2017, as registration, No. 5,202,624. Ex. 29. The services are retail and on-line stores store services in the fields of sports apparel, fitness equipment, and fitness classes. Peloton Interactive calls the store its PELOTON boutique.

**5.    Summary Judgment is proper because there are no material factual issues and Move Press is entitled to judgment as a matter of law.**

Summary judgment is appropriate when the evidence, viewed in the light most favorable to the nonmoving party, shows there is no genuine issue on any material fact, and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). The moving party bears the initial burden of demonstrating the facts necessary for one or more essential elements of each claim upon which the moving party seeks judgment. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the

moving party has met its initial burden, the nonmoving party must affirmatively present admissible evidence and identify specific facts enough to show a genuine issue for trial. *See Celotex,* 477 U.S. at 323-24; see also FED. R. CIV. P. 56(c). Summary judgment for the moving party is proper when a rational trier of fact could not find for the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses…." *Celotex*, 477 U.S. 317, 323-24 (1986). It is "not a disfavored procedural shortcut." *Id*. at 327.

Move Press seeks summary judgment holding defendant is liable for trademark infringement, finding there remains no genuine issue of material fact that consumers are likely to be confused or deceived by both parties' use of PELOTON. The Lanham Act prohibits the "use in commerce [of] any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services [when] such use is likely to cause confusion, or to cause mistake…." *Int'l Oddities v. Scott Record*, No. CV 12-3934-CAS (VBKx), 2013 U.S. Dist. LEXIS 103847 at *22-23, 2013 WL 3864050 (C.D. Cal. July 22, 2013) (citing 15 U.S.C. § 1114).

Plaintiff also moves for summary judgment on its related claims for unfair competition under federal and California law. Both unfair competition claims have the same test. *Cleary v. News Corp.*, 30 F.3d 1255, 1262-63 (9th Cir. 1994). Plaintiff also moves for summary judgment on its state law claim for false advertising because this claim is rooted in the theory of false designation of origin. Claims for false designation of origin have the same test as claims for trademark infringement. *Jada Toys, Inc. v. Mattel, Inc.*, 518 F.3d 628, 632 (9th Cir. 2007). "The 'ultimate test' for unfair competition is exactly the same as for trademark infringement: 'whether the public is likely to be deceived or confused by the similarity of the marks.'" *Century 21 Real Estate Corp. v. Sandlin*, 846 F.2d 1175, 1178 (9th Cir. 1988).

Summary judgment on plaintiff's claim requesting cancellation of registration

of defendant's PELOTON trademarks under 15 U.S.C. §§ 1119–20 also is proper. This court has the power under 15 U.S.C. § 1119 to cancel defendant's PELOTON registrations. A party who is not a mark's first user is not its owner so it is not entitled to registration. *Rearden LLC v. Rearden Commerce, Inc.*, 683 F.3d 1190, 1203 (9th Cir. 2012). A mark likely to cause confusion can be canceled. *B & B Hardware, Inc. v. Hargis Indus., Inc.,* 135 S. Ct. 1293, 1301 (2015) (holding that likelihood of confusion for registration is the same standard as likelihood of confusion for infringement (citing 15 U.S.C. § 1052(d)). This rule also supports judgment against the defendant's counterclaim for declaratory relief that its registrations are valid because it has no trademark rights in PELOTON.

### 6. Trademark Infringement

Having proven ownership, Move Press next must show infringement, i.e., likelihood of confusion, "the basic test for both common law trademark infringement and federal statutory trademark infringement." *Dr. Seuss Enters., L.P. v. Penguin Books USA, Inc.*, 109 F.3d 1394, 1403 (9th Cir. 1997). Infringement liability requires neither an intent to confuse nor actual confusion. *Coca-Cola Co. v. Overland, Inc.*, 692 F.2d 1250, 1256 n.16 (9th Cir. 1982)).

This is a case of reverse confusion because junior user Peloton Interactive flooded the market with advertising. *See Marketquest Grp., Inc. v. BIC Corp.*, 862 F.3d 927, 932 (9th Cir. 2017) (A reverse confusion theory "may allege that the defendant flooded the market with advertising, or that actual instances of reverse confusion occurred."). The primary question in both forward and reverse confusion cases, is whether the two marks are sufficiently similar that a "reasonably prudent consumer in the marketplace is likely to be confused as to the origin of the good or service bearing one of the marks." *Dreamwerks*, 142 F.3d at 1129 (9th Cir. 1998) (internal quotation marks omitted).

a.   **All eight *Sleekcraft* factors favor summary judgment of infringement.**

Trademark infringement cases in this circuit assess likelihood of consumer confusion by considering the *Sleekcraft* factors. *AMF, Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-49 (9th Cir. 1979) ("1. strength of the mark; 2. proximity of the goods; 3. similarity of the marks; 4. evidence of actual confusion; 5. marketing channels used; 6. type of goods and the degree of care likely to be exercised by the purchaser; 7. defendant's intent in selecting the mark; and 8. likelihood of expansion of the product lines.") *Marketquest*, 862 F.3d at 932. The *Sleekcraft* "analysis is pliant [and] illustrative rather than exhaustive." *Id.* at 934 (internal quotation marks omitted). "[T]he relative importance of each individual factor will be case-specific." *Id.* "[W]here the evidence is clear and tilts heavily in favor of a likelihood of confusion, [this Circuit has] not hesitated to affirm summary judgment on this point." *Au-Tomotive Gold, Inc. v. Volkswagen of Am., Inc.*, 457 F.3d 1062, 1075 (9th Cir. 2006); *Nissan Motor Co. v. Nissan Computer Corp.*, 378 F.3d 1002, 1019 (9th Cir. 2004) (affirming summary judgment where the marks were "legally identical," the goods were related, and the marketing channels overlapped); *Int'l Oddities*, 2013 U.S. Dist. LEXIS 103847 (granting summary judgment following brief review of *Sleekcraft* factors); *Earthquake Sound Corp. v. Bumper Indus.*, No. 98-17160, 1999 U.S. App. LEXIS 19968, (9th Cir. Aug. 18, 1999) (same).

**1)   Strength of the Mark: PELOTON is a strong mark.**

The mark's strength is not as important because both parties use the same mark for the same or similar goods. *See Brookfield Communs., Inc. v. West Coast Entm't Corp., Inc.*, 174 F.3d 1036, 1047, 1059 (9th Cir. 1999) (holding "strength of the mark is of diminished importance in the likelihood of confusion analysis" when both parties use the same mark on closely related goods). But the mark is strong.

Conceptual and commercial strength determine overall strength. Conceptual strength involves classification of a mark "along a spectrum of generally increasing

inherent distinctiveness as generic, descriptive, suggestive, arbitrary, or fanciful." *Network Automation, Inc. v. Advanced Sys. Concepts*, 638 F.3d 1137, 1149 (9th Cir. 2011). PELOTON for both parties' goods and services is suggestive because it "convey[s] impressions of goods that require the consumer to use imagination or any type of multistage reasoning to understand the mark's significance." *Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118, 1126 (9th Cir. 2014) (internal quotation marks omitted). Consumers must use imagination to reason "Peloton" is a magazine, stationary bike or products related to either. A suggestive mark is "strong enough to warrant trademark protection – because it requires a mental leap from the mark to the product." *Brookfield*, 174 F.3d at 1058. Suggestive marks are protected without evidence of secondary meaning. *Sleekcraft*, 599 F.2d at 349. Evidence of actual confusion discussed is proof of secondary meaning. *See Adray*, 76 F.3d at 988 (holding "bad faith adoption of a mark is a generally recognized exception to the requirement that secondary meaning be shown in a disputed area."); *Am. Scientific Chem. v. Am. Hosp. Supply*, 690 F.2d 791, 793 (9th Cir. 1982).

In reverse confusion cases, conceptual strength of the junior user (here defendant) governs. "*Walter v. Mattel, Inc.*, 210 F.3d 1108, 1111 n. 2 (9th Cir. 2000). *See also Dreamwerks*, 142 F.3d at 1130, n.5 ("[T]he greater the power of [the junior user's mark] in the marketplace, the more likely it is to capture the minds of [the senior user's] customers.").

Peloton Interactive admitted to another trademark challenger PELOTON is *not* descriptive (emphasis in original). Miller Decl. ¶ 2, Exs. 51 and 52.

1. The PELOTON trademark also is strong commercially. "Marks may be strengthened by extensive advertising, length of time in business …." *Century 21 Real Estate Corp. v. Sandlin*, 846 F.2d 1175, 1179 (9th Cir. 1988). In Move Press's eight years in business, it spent at least $10 million advertising and promoting its trademark

nationally[3] Roe Decl. ¶ 5 . Move Press has been in business using its PELOTON brand for eight years. For the period of 2012 to 2018, Move Press had at least 1 billion impressions, which is the total number of times that online consumers saw Move Press's PELOTON social media-content, and, during this same time period, 13.1 million individuals engaged with Move Press's PELOTON brand online, which means that 13.1 million individual people clicked through and interacted with Move Press's PELOTON social-content Roe Decl ¶ 6. Move Press's PELOTON brand had physical national recognition by consumers since early 2011. Id at para 7. The first issue of the PELOTON magazine was distributed and sold in Barnes & Noble stores in early 2011 and by mid-2011, Move Press's PELOTON magazine was available for purchase in the nation-wide supermarket chains of Safeway, Vons and Pavilions and Kroger locations. By the end of 2011, 25,000 print copies of PELOTON had been distributed nationwide and PELOTON had 15,000 digital subscribers. *Id.*

Defendant's almost ubiquitous advertising of PELOTON also makes the brand strong. Foley admits the company is now targeting everyone as potential consumers. Ex. 36 to Lang Decl. ¶9. The defendant admits it will likely spend hundreds of thousands of dollars just bidding on the Adword "Peloton" by year's end.

### 2) Proximity and Relatedness of the Goods: The goods are related because of they deal with bicycles, fitness and goods active persons use.

"The basic premise—that a trademark provides protection only when the defendant uses the mark on directly competing goods—is no longer good law." *Halicki Films, LLC v. Sanderson Sales & Mktg.*, 547 F.3d 1213, 1228 (9th Cir. 2008). "Related goods (or services) are those which would be reasonably thought by the buying public to come from the same source if sold under the same mark." *Rearden*, 683 F.3d at 1212-13 (citation and quotation marks omitted).

"Less similarity between the marks will suffice when the goods are

---

[3] In Move Press's early years, it sold SWITCHBACK and 3GO magazines, but since 2014, all advertising focused on PELOTON.

complementary. *Commc'ns Satellite Corp. v. Comcet, Inc.*, 429 F.2d 1245, 1253 (4th Cir. 1970), (noting, "Complementary products, or services, are particularly vulnerable to confusion."). *See also Sleekcraft*, 599 F.2d at 350, which cited *Comcet*. Move Press's print and digital magazine, social media and YouTube channels, Android and iTunes apps, journals, videos, slide shows and clothing, and its magazine articles covering lifestyle topics are complementary to Peloton Interactive's stationary bikes, streaming bicycling classes, clothing and equipment.

Both parties target outdoor cyclists. Foley admits that his product is great for outdoor riders to train. Ex. 44 to Lang Decl. ¶9. Peloton Interactive admits that it targets outdoor cyclists as potential customers, and it admits that it advertises at the same outdoor professional races as Move Press, such as the Tour de France . Ex. 45 to Lang Decl. ¶11; Ex. 34 to Lang Decl. ¶9.

Cases about complementary products include *Brookfield*, 174 F.3d at 1056. (database containing entertainment-industry related information related to video rental stores complementary where the parties "offer products and services relating to the entertainment industry generally"); *Dreamwerks*, 142 F.3d at 1129–32. (9th Cir. 1998) (sponsor of science fiction convention competes with Hollywood studio in reverse confusion suit); *Am. Int'l Grp., Inc. v. Am. Int'l Bank*, 926 F.2d 829, 832 (9th Cir. 1991) (insurance underwriter and bank compete although not direct competitors, their respective financial services "may be sufficiently 'complementary' or 'related' that the public is likely to be confused as to the source of the services"). Replace "entertainment industry" in *Brookfield*, "science fiction convention" and "Hollywood studio" in *Dreamwerks* or "underwriter" with "bank" in *American International* with "fitness clothes" or "publication about fitness and lifestyle," and we have this case.

"Magazine" cases support Move Press's position that confusion is likely when defendants sell products described in magazine articles or advertising. In *Hanson v. Triangle Pub'l, Inc.*, 163 F.2d 74 (8th Cir. 1947), plaintiff published SEVENTEEN, a magazine of fashions and other interests for teenage girls. Hanson infringed by selling

SEVENTEEN dresses In *Triangle Pub'l, Inc. v. Rohrlich*, 167 F.2d 969 (2nd Cir. 1948), Rohrlich used SEVENTEEN for girdles. Both cases held defendants' uses were likely to cause a confusion because the public might erroneously believe that defendants' dresses and girdles were advertised in or sponsored by the magazine. The court in *Esquire, Inc. v. Maira*, 101 F. Supp. 398 (M.D. Pa. 1951), the Court found ESQUIRE SHOP for a retail clothing store was likely to cause confusion with plaintiff's ESQUIRE magazine, which featured men's apparel, styles, trends and fashions. It is undisputed that the Defendant sells the same goods that PELOTON Magazine advertises. Indoor spin bikes advertise in the plaintiff's PELOTON magazine See Roe Decl. Para 2; Exhibit 1-7). Foley admits that its company creates films, advertises through social media, has a phone app, streams videos, and sells clothing, same as Move Press. Ex. 37 to Lang Decl. ¶9. Both parties are media companies. In an August 3, 2018, interview (at https://www.cnbc.com/video/2018/08/03/peloton-ceo-were-becoming-a-media-company-akin-to-netflix.html), CEO Foley said, "We're becoming a media company akin to Netflix." Move Press is also a media company. Roe Decl. ¶ 4; Exhibits 14-16. It is undisputed here that the defendant knew about Plaintiff's PELOTON mark as early as 2012, but that didn't hinder its plans to use the identical brand, the same marketing channels, and target the same consumers. Foley was alerted to the PELOTON magazine in 2012. Ex. 33 to Lang Decl. ¶ 9. Foley admits he may not have even bothered to read the 2014 letter from the plaintiff. Ex. 35 to Lang Decl. ¶9. Foley admits that the defendant targeted outdoor cyclists, same as plaintiff Move Press. Both parties deliver online and physical content about cycling. Roe Decl ¶ 3 Ex. 8-13 Both parties sell clothing and accessories with the PELOTON brand. Roe Decl ¶3 Ex. 11. Both parties advertise at the same professional cycling events, such as the Tour de France. Roe Decl. ¶ 23; Ex. 34 to Lang Decl. ¶ 9.

In the 2018 Tour de France, Move Press had a car prominently displaying plaintiff's PELOTON mark following the race. But defendant had PELOTON signs all over the race course with its largest display at the finish line. Roe Decl. ¶ 23. In past

years, Move Press advertised with NBC, which broadcasts the race to the United States, but Peloton Interactive sponsored the race on NBC in 2018. Roe Decl. ¶ 23. Sponsoring and advertising at an outdoor race like Tour de France shows defendant is further undisputed evidence that the defendant markets to outdoor bike riders like PELOTON magazine subscribers.

Move Press's PELOTON has many different types of subscribers for many different types of goods and services. Roe Decl. ¶ 15; Exhibit 21. Since 2011, PELOTON magazine has advertisers including without limitation businesses that sell clothing, shoes, accessories, GPS devices, heart monitors, spin bikes, food, indoor cycling trainers, computers, software, bike accessories, bike parts, and similar goods since 2011. *Id.*

Media placements are important for promoting plaintiff's PELOTON magazine. In past years, Move Press advertised PELOTON with NBC, which broadcasts the Tour de France to the United States. Roe Decl. ¶ 24. In 2018, defendant Peloton Interactive sponsored the race on NBC. Peloton Interactive's extensive advertising has crowded out the chance for people to see Move Press's PELOTON brand and the value of media placements has disappeared for our company. Id.

John Foley, Peloton Interactive's CEO and one of its founders, is an outdoor cyclist and triathlete. Ex. 31 to Lang Decl. ¶ 9. He worked for Barnes and Noble as president of e-commerce from 2010 to 2012. Ex. 30 to Lang Decl. ¶ 9. Foley admits he knew about Move Press's use and registration of PELOTON at least as early as 2012 after his mom told him Ex. 32 to Lang Decl. ¶9; Ex. 33 to Lang Decl. ¶ 9, and, despite knowledge of Move Press's PELOTON, he selected the identical mark PELOTON to use for his start-up company's goods and services. Foley testified that after he received a cessation demand from Move Press in 2014, he would not stop using PELOTON. Ex. 36 to Lang Decl. ¶9. Peloton Interactive claims it sold its first PELOTON-branded stationary spinning bikes in early 2014, four years after the plaintiff first sold its PELOTON goods and services. See Peloton Interactive's trademark registration,

and at least two years after it learned about plaintiff's PELOTON magazine. Ex. 37 to Lang Decl. ¶9. Foley admits he never considered Move Press or their trademark rights as a threat to his plans. Ex. 42 to Lang Decl. ¶9. Foley considered Move Press's advertising expenditures as "de mimimus." Ex. 40 to Lang Decl. ¶9. Foley admits they plan to use the brand PELOTON in the future with "full force." Ex. 43 to Lang Decl. ¶9. Thomas Cortese, a co-founder of the defendant, confirms the defendant knew about Move Press's PELOTON magazine at least as early as 2012. Ex. 47 to Lang Decl. ¶11.

"[D]efendant acted with 'an aura of indifference to plaintiff's rights—in other words, that the defendant willfully blinded himself to facts that would put him on notice that he was infringing another's trademarks, having cause to suspect it." *Philip Morris USA Inc. v. Liu*, 489 F. Supp. 2d 1119, 1123 (C.D. Cal. 2007) (trademark counterfeiting case where willful infringement can increase statutory damages.). And Peloton Interactive's failure to stop using PELOTON after receiving a letter from Move Press's attorney in 2014, supports willfulness. *See GoLight, Inc. v. Wal-Mart Stores, Inc.*, 355 F.3d 1327, 1339 (Fed. Cir. 2004) (failing to take appropriate action upon receipt of a cease-and-desist letter in patent action supports willfulness finding).

### 3)  Similarity of the Marks: They are identical in sound, sight and meaning.

This factor favors Move Press because both parties use the identical mark PELOTON. "[T]he more similar the marks in terms of appearance, sound, and meaning, the greater the likelihood of confusion." *Brookfield*, 174 F.3d at 1054.

### 4)  Evidence of Actual Confusion: The substantial evidence of actual confusion is strong evidence of likelihood of confusion.

Move Press's PELOTON goods and services have been confused as to the source of origin with the goods and services offered by the defendant. Berj Alexanian with FCA Group arranged for Move Press to review an Alfa Romeo Stelvio for PELOTON Magazine. When he delivered the car to Move Press's PELOTON offices in

April 2018, he sent me a personal note that said: "My coworker just took delivery of a new Peloton bike today." Roe Decl. ¶ 17. The owner of Lift CS Agency in San Diego, a cycling industry insurance agency, asked the CEO of Move Press at a cycling event about PELOTON magazine's [Move Press's] affiliation with the PELOTON bike [Peloton Interactive] and whether Peloton Interactive had to pay Move Press a license fee to use PELOTON. Roe Decl. ¶ 17. WME/IMG, a provider of entertainment and sports programming, had a call with its team and Brad Roe, CEO of Move Press, in 2016 regarding Move Press providing PELOTON-branded cycling packages and PEL-OTON-branded global live racing in the North American markets and related video content. Roe Decl. ¶ 19. At some point during that call, the WME/IMG executives stated they believed Move Press was affiliated with defendant Peloton Interactive. Roe Decl. ¶ 19. Despite Mr. Roe correcting the confusion, the executives ended the meeting and did not hire Move Press to provide a subscription-based live cycling package for WME/IMG. Roe Decl. ¶ 19.

Move Press's PELOTON social media accounts get notified when it is tagged in a social media post. Roe Decl. ¶ 20; Ex. 22. Move Press's PELOTON social media accounts have been confused by social media users thinking that Move Press's PELOTON is affiliated with the defendant. *Id*. Many examples of this type of confusion exist. *Id*.]. It is undisputed that social media users have experienced actual confusion. *Id*.

Move Press's PELOTON business has received inquiries from advertisers who want to advertise with PELOTON, but when they discover that Move Press's PELOTON magazine is not affiliated with the defendant, they decline to move forward. Roe Decl. ¶ 21; Ex. 23 Business inquires at: Bates No. 013876-013878; Bates No. 017866, Bates No 016851-01655; 012128-012130; 001416-001413.

Tim Schamber, Move Press's creative director, recently moved to Portland. When he meets new people whom he knows are bike riders, they frequently ask what he does for a living. When he says he works for "Peloton," they comment about PELOTON bikes, which means they are referring to Peloton Interactive. Many respond

with statements showing a belief that PELOTON magazine is related to Peloton Interactive. Schamber Decl. ¶ 6.

Actual confusion "is persuasive proof that future confusion is likely." *Sleekcraft*, 599 F.2d at 352. "[R]eason tells us that while very little proof of actual confusion would be necessary to prove the likelihood of confusion, an almost overwhelming amount of proof would be necessary to refute such proof." *World Carpets, Inc. v. Dick Littrell's New World Carpets*, 438 F.2d 482, 489 (5th Cir. 1971) (quoted in *Cooper v. Revolution Records*, No. 96-55927, 1997 U.S. App. LEXIS 8128, at *14, 1997 WL 196650, *5 (9th Cir. Apr. 21, 1997).

### 5) Marketing Channels Used: The parties use the same marketing channels including social media, newsletters and the Internet.

As discussed above, Move Press has a strong social media presence and it uses the Internet to transmit PELOTON newsletters, digital versions of its magazine and sells PELOTON clothing over the Internet. Also discussed above, the defendant does the same. Also discussed at length is the undisputed evidence that the parties advertise at the same events, such as the Tour de France.

### 6) Type of Goods and the Degree of Care Likely to be Exercised by the Purchaser: Customers are unsophisticated about the features and quality of the goods.

Peloton Interactive may argue customers buying its $2,000 bike are sophisticated and exercise a high degree of care. But Peloton Interactive does not compare its bike to other companies' bikes. It merely advertises a fitness lifestyle targeted to all people. Plaintiff's PELOTON Magazine also advertises a fitness lifestyle. Both companies endeavor with their advertising to create a fitness community and inspire athleticism. Roe Decl. ¶ 2 Ex. 1-7.

Having smart customers does not necessarily preclude confusion if the similarity between the marks is too great. *Dresser Indus. v. Heraeus Engelhard Vacuum, Inc.*, 395 F.2d 457, 462 (3d Cir. 1968). Here, the marks are identical.

The rationale in *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867 (2d Cir. 1986), applies here. The goods were jeans, and the mark was the back-pocket stitching pattern. Defendant argued the jeans buyers' sophistication precluded confusion. The court disagreed. Consumers would assume the identical stitching pattern on both parties' jeans "indicates some sort of association between the two manu-facturers." *Id.* at 876.

[W]here the products are identical, and the marks are identical, the sophistica-tion of buyers cannot be relied on to prevent confusion. *McGregor-Doniger Inc. v. Drizzle Inc.*, 599 F.2d 1126, 1137 (2d Cir. 1979); s*ee also Charles Schwab & Co. v. Hibernia Bank*, 665 F. Supp. 800, 811 (N.D. Cal. 1987) (holding sophistication could make confusion more likely because customers knowing of Schwab's divestiture from Bank of America might assume a new affiliation with defendant).

**7)  Defendant's Intent in Selecting the Mark: Peloton Interactive is an intentional infringer that sold products and offer services under the PELOTON brand though it knew about Move Press's earlier use of the same brand.**

"[A]ssessment of *Sleekcraft*'s intent factor … is different when we consider a forward confusion theory than it is when we consider a reverse confusion theory, be-cause the relevance of intent varies with the underlying theory of confusion." *Marketquest*, 862 F.3d at 934. In forward confusion, the question is whether defendant adopted its mark with intent to capitalize on plaintiff's good will. *Id.* Typically with reverse confusion, it can be that "neither junior nor senior user wishes to siphon off the other's goodwill." *Dreamwerks*, 142 F.3d at 1130. Rather, in a reverse confusion case:

[T]he court may consider at its discretion several indicia of intent, such as evidence that the defendant pushed plaintiff out of the market by flooding the market with advertising, or evidence that defendant knew of or should have known of the mark, or evidence that the defendant failed

to conduct a reasonably adequate trademark search, or evidence that the
defendant otherwise culpably disregarded the plaintiff's trademark or
took proactive steps to avoid the risk of reverse confusion.

*Marketquest,* 862 F.3d at 934-953. Here, Move Press has evidence of all these examples.

The CEO and founder of the defendant John Foley worked at Barnes and Noble as president of e-commerce from 2010 to 2012 when Plaintiff launched its PELOTON brand there. Foley admits he knew about Move Press's use and registration of PELOTON at least as early as 2012 after his mom told him Ex. 32 to Lang Decl. ¶9; Ex. 33 to Lang Decl. ¶9., and despite, knowledge of Move Press's PELOTON, he selected the identical mark PELOTON to use for his start-up company's goods and services. Foley testified that after he received a cessation demand from Move Press in 2014, he would not stop using PELOTON. Ex. 36 to Lang Decl. ¶9. Foley admits he never considered Move Press or their trademark rights as a threat to his plans. Ex. 42 to Lang Decl. ¶9. Foley considered Move Press's advertising expenditures as "de mimimus." Ex. 40 to Lang Decl. ¶9. Foley admits they plan to use the brand PELOTON in the future with "full force." Ex. 43 to Lang Decl. ¶9. Thomas Cortese, a co-founder of the defendant, confirms the defendant knew about Move Press's PELOTON magazine at least as early as 2012. Ex. 47 to Lang Decl. ¶11

When the alleged infringer knowingly adopts a mark similar to another's, reviewing courts presume that the defendant can accomplish his purpose: that is, that the public will be deceived." *Sleekcraft*, 599 F.2d at 354. "[T]he burden of explanation and persuasion" that Peloton Interactive is not an intentional infringer switches to defendant by its adopting Move Press's identical mark PELOTON after learning Move Press used the mark. *Kiki Undies Corp. v. Promenade Hosiery Mills, Inc.*, 411 F.2d 1097, 1101 (2d Cir. 1969) (rationale applied to plaintiff's registered trademark, not common law mark).

*Entrepreneur Media v. Smith*, 279 F.3d 1135 (9th Cir. 2002), shares a similarity

with this case. After defendant learned people thought his trademark was related to plaintiff's ENTREPRENEUR magazine, he said "Yeah, it's great." Defendant made his statement after his use began. While the statement might not be as important to his intent *when* he adopted the mark, it is relevant "to his intent in continuing to use the mark and, as such, is pertinent to liability for trademark infringement." *Id*. at 1149.

Peloton Interactive knew of PELOTON magazine in 2012, years before it started selling products, and it received Move Press's cease and desist letter in 2014. It continued to promote its PELOTON knowing Move Press's superior rights.

> **8)   Likelihood of Expansion of the Product Lines. Because the goods and services already overlap, this factor also favors Move Press.**

When the goods already overlap as they do here, this factor has "minimal legal significance." *Stone Creek*, 875 F.3d at 435-36 (9th Cir. 2017). This factor also favors Move Press because the parties use the same mark for related goods. *Earthquake Sound,* 1999 U.S. App. LEXIS 19968, at *10, 1999 WL 638681; *See also Conversive, Inc. v. Conversagent, Inc.,* 433 F. Supp. 2d 1079, 1093 (C.D. Cal. 2006) (holding likelihood of expansion favors likelihood of confusion "because the product lines are already similar").

> **b.   Summary judgment is proper here because Peloton Interactive has no material facts disputing Move Press's ownership of the PELOTON mark, and all eight *Sleekcraft* factors support likelihood of confusion.**

The evidence shows Move Press's common law trademark rights are superior to any common law rights or registrations Peloton Interactive claims. No evidence supports any *Sleekcraft* factor in Peloton Interactive's behalf. Summary judgment, therefore, is proper.

> **c.   Confusion harms Move Press.**

The danger to a trademark owner selling goods related to those of an infringer "is that the public will mistakenly assume there is an association between the

producers of the related goods, though no such association exists." *Sleekcraft*, 599 at 350. That mistaken assumption causes a trademark owner to lose control over its business reputation. See *Herb Reed Enters., LLC v. Fla. Entm't Mgmt.*, 736 F.3d 1239, 1250 (9th Cir. 2013) (holding the loss of control can be irreparable harm).

## C.   INJUNCTIVE RELIEF IS AN APPROPRIATE REMEDY

The Seventh Amendment preserves the right to a jury trial for legal claims but not for equitable claims. *Danjaq LLC v. Sony Corp.*, 263 F.3d 942, 962 (9th Cir. 2001). The Lanham Act "vests the district court with the power to grant injunctions according to principles of equity and upon such terms as the court may deem reasonable, to prevent the violation of any right of the trademark owner." *Perfumebay.com, Inc. v. eBay, Inc.*, 506 F.3d 1165, 1176-77 (9th Cir. 2007). A party seeking permanent injunctive relief in a trademark action must satisfy the four-factor test in *eBay, Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006):

> (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

A district court has a wide range of discretion in formulating an injunction. *Id. at 391*; *Adray*, 76 F.3d at 990. All four *Ebay* factors support Move Press. First, it has suffered an irreparable injury. Evidence of intangible injury such as damage to Move Press's goodwill, which the evidences established, is irreparable harm. *Stuhlbarg Int'l Sales Co. v. D. Brush & Co.*, 240 F.3d 832, 841 (9th Cir. 2001). So is evidence of losing control over one's business reputation. *See Herb Reed, 736 F.3d at 1250*. Move Press introduced evidence of actual reverse confusion among its consumers causing plaintiff's reputation and goodwill have suffered.

The second *eBay* factor requires showing the inadequacy of legal remedies. The difficulty of proving actual damages may suggest that damages are inadequate and

favors equitable relief. _Anhing Corp, v. Thuan Phong Co_., No. CV 13-05167 BRO

(MANx), 2015 U.S. Dist. LEXIS 97019, at *70-71, 2015 WL 4517846 (C.D. Cal. July

24, 2015) (citing 5 McCarthy § 30:1 (noting without an injunction, likelihood of con-

fusion continues "depriv[ing] the consuming public of a truthful marketplace.) 2015

U.S. Dist. LEXIS 97019, at *69-70; _Cont'l Airlines, Inc. v. Intra Brokers, Inc._, 24

F.3d 1099, 1105 (9th Cir. 1994). Reverse confusion cases, such as the one established

by Move Press, are notoriously difficult in terms of meeting the evidentiary burden in

establishing its actual damages due to speculation. This factor thus favors injunctive

relief. More important is the risk that the defendant will continue to engage in infring-

ing conduct, which is why permanent injunctions are "the usual and normal remedy"

for trademark infringement. _Anhing_, 2015 U.S. Dist. LEXIS 97019, at *70-71, 2015

WL 4517846 (C.D. Cal. July 24, 2015) (citing 5 McCarthy § 30:1 (noting without an

injunction, likelihood of confusion continues "depriv[ing] the consuming public of a

truthful marketplace.) _See also Polo Fashions, Inc. v. Dick Bruhn, Inc._, 793 F.2d 1132,

1135-36 (9th Cir. 1986) (finding the district court erred in denying a permanent in-

junction simply because the plaintiff failed to offer evidence suggesting the defendant

would infringe in the future)). Move Press offered undisputed evidence that the de-

fendant intends to continue to infringe. This factor weighs in plaintiff's favor.

   The balance of hardships, the third _Ebay_ factor, weighs in Move Press's favor

because an injunction will merely require the defendant to cease its willfully infring-

ing activities. _See Audi AG v. D'Amato_, 469 F.3d 534, 550 (6th Cir. 2006) (noting a

defendant suffers no hardship in merely "refraining from willful trademark infringe-

ment"). The fourth _Ebay_ factor analyzes whether a permanent injunction is in the pub-

lic interest. The public interest has been defined as "the right of the public not to be

deceived or confused." _CytoSport, Inc. v. Vital Pharm., Inc._, 617 F. Supp. 2d 1051,

1081 (E.D. Cal. 2009), _aff'd_, 348 Fed. App'x. 288 (9th Cir. 2009) (unpublished); _see_

_also Internet Specialties W., Inc. v. Milon-DiGiorgio Enters., Inc._, 559 F.3d 985, 993

n.5 (9th Cir. 2009) ("The public has an interest in avoiding confusion between two

companies' products."). Because Move Press has established without dispute there is a likelihood of confusion between the source of goods bearing the PELOTON mark, it prevails on this factor too.

**Conclusion**

Move Press requests that the court grant judgment for the plaintiff on defendant's liability on all its claims and conclude that permanent injunctive relief is also appropriate.

January 7, 2019                        _/s/ Michael Harris_____

Michael D. Harris
SoCal IP Law Group LLP

Attorneys for plaintiff Move Press, LLC