UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES – GENERAL

| Case No. | LA CV18-01686 JAK (RAOx) | Date | September 5, 2019 |
|---|---|---|---|
| Title | Move Press, LLC v. Peloton Interactive, Inc. | | |

| Present: The Honorable | JOHN A. KRONSTADT, UNITED STATES DISTRICT JUDGE |
|---|---|
| Andrea Keifer | Not Reported |
| Deputy Clerk | Court Reporter / Recorder |
| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
| None Present | None Present |

**Proceedings:** (IN CHAMBERS) ORDER RE DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DKT. 36); PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON TRADEMARK INFRINGEMENT AND RELATED CLAIMS (DKT. 43)

**I.      Introduction**

Plaintiff, Move Press, LLC ("Move Press"), brought this trademark infringement action against Peloton Interactive, Inc. ("Peloton"). Dkt. 1. Each party uses the term PELOTON on a mark related to its goods and services. On April 29, 2018, Move Press filed a first amended complaint ("FAC") advancing five causes of action: (i) Infringement of a Federally Registered Trademark in violation of 15 U.S.C. § 1114; (ii) Unfair Competition under Lanham Act Section 43(a), 15 U.S.C. § 1125(a); (iii) Unfair Competition under California Law in violation of Cal. Bus. & Prof. Code §§ 17200 *et seq*.; (iv) California False Advertising Law in violation of Cal. Bus. & Prof. Code §§ 17500 *et seq*; and (v) Cancellation of Peloton's Trademark Registrations. Dkt. 18.

On May 4, 2018, Peloton filed four counterclaims against Move Press seeking the following remedies: (i) cancellation of Move Press's registrations for its PELOTON marks; (ii) declaratory judgment regarding continued registration and validity of Peloton's PELOTON trademarks; (iii) declaratory judgment of non-dilution; and (iv) declaratory judgment of non-infringing use. Dkt. 19.

On January 1, 2019, Peloton and Move Press filed cross-motions for summary judgment. Dkt. 36 ("Peloton Motion"), 43 ("Move Press Motion"). The parties filed oppositions on January 22, 2019, Dkt. 56, 63, and then each replied on January 28, 2019. Dkt. 75, 85. A hearing on the cross-motions was conducted on March 5., 2019, and they were taken under submission. Dkt. 92. On August 13, 2019, Peloton filed a notice of supplemental authority. Dkt. 97. Move Press filed a response on August 16, 2019. Dkt. 98.

For the reasons stated in this Order, the Peloton Motion is **GRANTED** and the Move Press Motion is **DENIED** as **MOOT** and on the merits.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV18-01686 JAK (RAOx) | Date | September 5, 2019 |
|---|---|---|---|
| Title | Move Press, LLC v. Peloton Interactive, Inc. | | |

## II. Background

### A. Move Press, LLC

Move Press uses the mark PELOTON in connection with the print and digital publication of its PELOTON Magazine. That publication features articles designed to appeal to the cycling community. Plaintiff's Statement of Uncontroverted Facts ("PSUF"), Dkt. 49, ¶ 38. The first issue of PELOTON Magazine was distributed nationally in 2011. Declaration of Bradley Roe ("Roe Decl."), Dkt. 45, ¶ 2. Move Press also uses the PELOTON mark in connection with its website, blog, documentary films, mobile applications and social media. PSUF ¶ 9. Move Press also sells clothing, bags, footwear, hats and drinking containers on the www.pelotonshop.com website.

On September 7, 2010, Move Press applied for a federal trademark on the Principal Register for its PELOTON mark, which was to be used in connection with "magazines in the field of bicycles." Declaration of Jedidiah Wakefield ("Wakefield Decl."), Dkt. 37-18 (Ex. 15). The United States Patent and Trademark Office ("PTO") denied this application on December 16, 2010, on the ground that the mark was "merely descriptive" of the magazine. Wakefield Decl., Dkt. 37-20 (Ex. 17). The PTO issued Move Press's mark on the Supplemental Register on July 19, 2011, as Registration No. 3,999,969. PSUF ¶ 33. On August 14, 2014, Move Press filed another application for its PELOTON mark on the Principal Register. *Id*. ¶ 34. On October 27, 2015, the PTO granted Move Press's registration for PELOTON on the Principal Register for magazines and online magazines "featuring cycling, racing, food, travel, clothing shoes, sports equipment, sports apparel, health, nutrition, film, and photography." *Id*.

### B. Peloton Interactive, Inc.

Peloton is a home fitness company that was established in January 2012. It sells indoor exercise equipment and subscriptions to its on-demand fitness classes. Defendant's Statement of Uncontroverted Facts ("DSUF"), Dkt. 37, ¶ 1; Declaration of John Foley ("Foley Decl."), Dkt. 38, ¶ 6. Foley, who is a co-founder of Peloton, declares that he selected the name Peloton for the company in 2011. Foley Decl. ¶ 7. Foley chose the name Peloton to reflect the team-oriented actions of those in a peloton -- a group of riders working collaboratively while bicycling together. He concluded that the name would evoke the supportive group environment the company sought to foster through its virtual group fitness classes. *Id*. ¶ 8.

On November 9, 2012, Peloton filed an application for federal registration of the PELOTON mark for use in connection with "stationary bicycles equipped with interactive computer systems, video players, and body bars," "downloadable software in the nature of an application for use by individuals participating in exercise classes, physical training, and exercise instruction," and "streaming of audio and video materials on the Internet featuring physical fitness classes, training, and instruction." DSUF ¶ 2. The PTO published Peloton's application on September 24, 2013, and registered the mark on the Principal Register on August 5, 2014 as Registration No. 4580888. *Id*. ¶ 3. Peloton also owns federal registrations to use the mark PELOTON in connection with the following: (i) sports apparel (Registration No. 5,200,495); (ii) as a service mark for retail and online store services in the field of sports apparel, fitness equipment, and fitness classes (Registration No. 5,202,624); and (iii) for its stylized *"P"* logo (Registration No. 4,565,106). PSUF ¶¶ 36-37.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| | | | |
|---|---|---|---|
| Case No. | LA CV18-01686 JAK (RAOx) | Date | September 5, 2019 |
| Title | Move Press, LLC v. Peloton Interactive, Inc. | | |

On June 24, 2013, Peloton launched a Kickstarter campaign and began accepting orders for the Peloton bicycle. DSUF ¶ 5. At this same time, Peloton also launched its website www.pelotoncycle.com. *Id*. ¶ 7. The Kickstarter campaign and the website displayed the PELOTON mark in connection with Peloton's indoor exercise bicycle and streaming group fitness classes. In September 2013, customers could purchase the Peloton bicycle on Peloton's website. *Id*. ¶ 8. Peloton began shipping its exercise bicycles in January 2014. *Id*. ¶ 13.

**III.**    **Analysis**

   A.    Peloton's Motion for Summary Judgment

      1.    Legal Standards

A motion for summary judgment will be granted where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party seeking summary judgment bears the initial burden of informing the Court of the basis for its motion and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Where the moving party will have the burden of proof on an issue at trial, the movant must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. On an issue as to which the nonmoving party will have the burden of proof, however, the movant can prevail merely by pointing out that there is an absence of evidence to support the nonmoving party's claims. *See id*. If the moving party meets its initial burden, the nonmoving party must set forth "specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby*, Inc., 477 U.S. 242, 250 (1986); Fed. R. Civ. P. 56(e).

Evidence presented by the parties at the summary judgment stage must be admissible. Fed. R. Civ. P. 56(e). The Court does not make credibility determinations or weigh conflicting evidence; it draws all inferences in the light most favorable to the nonmoving party. *See T.W. Electrical Service, Inc. v. Pacific Electrical Contractors Ass'n*, 809 F.2d 626, 630–31 (9th Cir. 1987). Conclusory, speculative testimony in affidavits and moving papers, however, is insufficient to raise genuine issues of fact and defeat summary judgment. *See Thornhill Publishing Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

"Laches is an equitable time limitation on a party's right to bring suit, resting on the maxim that one who seeks the help of a court of equity must not sleep on his rights." *Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, 304 F.3d 829, 835 (9th Cir.2002) (internal citations and quotation marks omitted). Laches is a defense to both Lanham Act claims (including trademark infringement and unfair competition) as well as to California state law claims. *Id*.

Courts make laches determinations "with reference to the limitations period for the analogous action at law." *Jarrow*, 304 F.3d at 835–36. "If the plaintiff filed within that period, there is a strong presumption against laches. If the plaintiff filed outside that period, the presumption is reversed." *Tillamook Country Smoker, Inc. v. Tillamook Cty. Creamery Ass'n*, 465 F.3d 1102, 1108 (9th Cir. 2006). To establish that

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV18-01686 JAK (RAOx) | Date | September 5, 2019 |
|---|---|---|---|
| Title | Move Press, LLC v. Peloton Interactive, Inc. | | |

laches bars a claim, a defendant must "prove both an unreasonable delay by the plaintiff and prejudice to itself." *Evergreen Safety Council v. RSA Network Inc.*, 697 F.3d 1221, 1226 (9th Cir. 2012) (quotation omitted).

    2.    <u>Application</u>[1]

        a)    The Laches Presumption

The Lanham Act does not include a specific statute of limitations. Therefore, the limitations period is borrowed from analogous state law. *Jarrow*, 304 F.3d at 836. In this case, the most analogous limitation period is the four-year statute of limitations under California law. *See* Cal. Code Civ. Proc. § 343; *Pinkette Clothing, Inc. v. Cosmetic Warriors Ltd.*, 894 F.3d 1015, 1025 (9th Cir. 2018) ("[t]he most analogous state statute of limitations in this case is California's four-year statute of limitations for trademark infringement actions"); *Internet Specialties W., Inc. v. Milon-DiGiorgio Enterprises, Inc.*, 559 F.3d 985, 990 (9th Cir. 2009) (applying the four-year limitations period from California trademark infringement law).[2]

The parties dispute the accrual date of Plaintiff's claims to which the laches analysis would apply. "[T]he limitations period runs from the time the plaintiff knew or should have known about his § 43(a) cause of action," *Jarrow*, 304 F.3d at 838, which means when the plaintiff "knew or should have known about the likelihood of confusion between its mark and [the defendant's] mark." Internet Specialties, 559 F.3d at 990. The limitations period stops "when the lawsuit in which the defendant seeks to invoke the laches defense is initiated." *Eat Right Foods Ltd. v. Whole Foods Mkt., Inc.*, 880 F.3d 1109, 1116 (9th Cir. 2018) (internal quotation and citation omitted). Peloton argues that the limitations period began to run in 2013; Move Press argues that it began to run in mid-2014.

Peloton launched its Kickstarter campaign on June 24, 2013, and began accepting orders for its indoor exercise bicycle. DSUF ¶ 5. The Kickstarter campaign webpage displayed the PELOTON trademark in connection with the Peloton indoor exercise bicycle and advertised Peloton's streaming group fitness classes. *Id*. ¶ 6. Also, in June 2013, Peloton launched its website www.pelotoncycle.com, which featured the PELOTON trademark in connection with images of Peloton's indoor exercise bicycle. *Id*. ¶ 7. Peloton's launch in 2013 received national media coverage in The Wall Street Journal and Time

---

[1] In its Response to Peloton's Supplemental Authority, Move Press argues that the doctrine of laches does not apply to claims of willful infringement. Dkt. 98. This position is premised on the argument by Move Press that there is no genuine issue of fact as to whether Peloton willfully infringed the mark. Because that position is not adopted in the analysis of the Move Press Motion, this related argument also fails in connection with the present proceedings. *See Eat Right Foods Ltd. v. Whole Foods Mkt., Inc.*, No. 18-35473, 2019 WL 3408896, at *2 (9th Cir. July 29, 2019) (the doctrine of willful infringement does not preclude the laches defense where the circumstantial evidence did not leave the court "with a firm conviction" that Whole Foods knew it was infringing) (citing *Jarrow*, 304 F.3d at 842).

[2] Peloton argues that California's two-year "catch all" limitations period for tort claims should apply. Dkt. 36 at 14; Cal. Code Civ. Proc. § 339. That argument is unpersuasive. Peloton cites *Mission Imports, Inc. v. Superior Court* for the proposition that "[a]n action for trademark infringement sounds in tort." 31 Cal. 3d 921, 931 (1982). There, the issue was whether venue was proper for a declaratory relief claim based on a contract. *Mission Imports* did not address the proper statute of limitations to apply in a trademark action.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV18-01686 JAK (RAOx) | Date | September 5, 2019 |
|---|---|---|---|
| Title | Move Press, LLC v. Peloton Interactive, Inc. | | |

Magazine. *Id*. ¶ 9. The PTO also published Peloton's trademark application for its PELOTON mark on September 24, 2013. *Id*. ¶ 3.

After Peloton's launch in 2013, Move Press's Creative Director, Tim Schamber, received an email about Peloton from a former Move Press employee and forwarded it to Bradley Roe. *Id*. ¶ 14. In his deposition testimony, Roe admitted that, after he received the email in late 2013, he visited Peloton's website and saw that Peloton was using the PELOTON mark and offering an indoor exercise bicycle with the name Peloton. *See* Bradley Roe Deposition at 28:5-22. Roe also testified that he "was concerned that someone was using our name [Peloton] in a bike-related business" because Move Press "had the trademark for that name." *Id*. at 32:19-33:4.

Based on this evidence, Move Press knew or should have known about the likelihood of confusion between Peloton and Move Press's PELOTON mark in 2013. *See Eat Right Foods Ltd. v. Whole Foods Mkt., Inc.*, No. 18-35473, 2019 WL 3408896, at *1 (9th Cir. July 29, 2019) ("*Eat Right II*") (affirming the district court's finding of constructive knowledge of Whole Foods' alleged infringement in early 2010, "at which point Whole Foods had publicized the Eat Right America campaign on its website and rolled out the campaign in its stores."). Assuming, *arguendo*, Move Press is correct that the laches period did not begin until Peloton first shipped its products, that was also more than four years before this action was filed. *See* Dkt. 63 at 6. Peloton began shipping its indoor exercise bicycles in January 2014, which is more than four years before Move Press filed this action on February 28, 2018. DSUF ¶ 13. Because Move Press filed outside the four-year limitations period, there is a strong presumption in favor of applying a laches defense. *Pinkette Clothing*, 894 F.3d at 1025. This presumption may be rebutted if Move Press can "show that its delay in suing was nonetheless reasonable." *Eat Right Foods*, 880 F.3d at 1117.

    b)  Progressive Encroachment

Move Press argues that the doctrine of progressive encroachment justifies its delay in bringing this action because Peloton now sells clothing and has a blog and digital content that are independent of its stationary bicycles. Dkt. 63 at 11. Further, Move Press argues Peloton now targets a broader audience with an advertising budget that has at least doubled since it started its business operations. *Id*.

'Under this doctrine, the trademark owner need not sue in the face of *de minimis* infringement by the junior user.'" *Tillamook*, 465 F.3d at 1110 (quoting *Prudential Ins. Co. of Am. v. Gibraltar Fin. Corp. of Cal.*, 694 F.2d 1150, 1154 (9th Cir.1982). "Instead, a trademark owner's obligation to sue arises when the junior user redirects or expands its business into different regions or markets bringing it into direct competition with the trademark owner." *Saul Zaentz*, 627 F.Supp.2d at 1114 (citing *Tillamook*, 465 F.3d at 1110); *see also Grupo Gigante SA De CV v. Dallo & Co.*, 391 F.3d 1088, 1103 (9th Cir. 2004) ("A defendant can encroach on a plaintiff's mark by expanding its business into different regions or different markets."). Nevertheless, "[a] junior user's growth of its existing business and the concomitant increase in its use of the mark do not constitute progressive encroachment." *Tillamook*, 465 F.3d at 1110.

The undisputed facts weigh against the application of progressive encroachment. Peloton has been selling PELOTON-branded apparel and accessories since it launched its Kickstarter campaign in 2013. Foley Decl. ¶ 67. Further, Peloton has been producing video content in the form of fitness classes since its inception. *Id*. ¶ 65. At all times, Peloton has targeted "almost everyone who has any interest in

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV18-01686 JAK (RAOx) | Date | September 5, 2019 |
|---|---|---|---|
| Title | Move Press, LLC v. Peloton Interactive, Inc. | | |

fitness." *See* Bradley Roe Deposition at 106:24-107:1. Accordingly, Peloton was always selling clothing and creating digital content to a broad target audience. Peloton's growth of its video fitness classes beyond indoor cycling does not reflect a further expansion into the market in which Move Press operates. By introducing the Peloton Tread and by growing its library of on-demand fitness classes, Peloton has been growing "its existing business and the concomitant increase in its use of [PELOTON] [does] not constitute progressive encroachment. *Tillamook*, 465 F.3d at 1110; *Prudential Ins*., 694 F.2d at 1154 ("growth alone does not infringement make"). Therefore, progressive encroachment does not justify the delay by Move Press.

        c)      Unreasonable Delay

To determine whether a delay is reasonable, a court must "look to the cause of the delay." *Evergreen*, 697 F.3d at 1227. The Ninth Circuit has identified six factors that can be considered in determining whether a delay is reasonable. *E–Systems Inc. v. Monitek, Inc*., 720 F.2d 604, 607 (9th Cir. 1983). They are as follows: (i) strength and value of trademark rights asserted; (ii) plaintiff's diligence in enforcing mark; (iii) harm to senior user if relief denied; (iv) good faith ignorance by junior user; (v) competition between senior and junior users; and (vi) extent of harm suffered by junior user because of senior user's delay.

The first two factors weigh in favor of Peloton. As to the first one, the parties' PELOTON marks are relatively weak because they are descriptive or suggestive. *See Grupo Gigante*, 391 F.3d at 1102 ("Descriptive or suggestive marks are relatively weak."). However, in comparing them, Peloton's mark is substantially more valuable due to its "rapid and continuing growth" relative to that of Move Press. *See E-Systems*, 720 F.2d at 607.

As to the second factor, Move Press was not diligent in protecting its mark since it adopted it in 2011. The undisputed facts establish that Move Press had actual and constructive knowledge of likelihood of confusion in 2013. However, Move Press did not file an opposition or seek to cancel any of Peloton's federal registrations. DSUF ¶ 37. Nor did Move Press seek to enforce its rights in the PELOTON mark against the other companies using PELOTON in connection with bicycle-related goods and services. *Id*. ¶ 39. Move Press's lack of diligence is also reflected in the three-and-a-half-year delay between July 13, 2014, when it sent Peloton a cease and desist letter, and the filing of this action on February 28, 2018.

The third factor, which is the harm to Move Press if relief is denied, "turns largely on the court's analysis of the likelihood of confusion." *Fitbug Ltd. V. Fitbit, Inc.*, 78 F.Supp.3d 1180, 1193-94 (N.D. Cal. 2015) (citing *RSI Corp. v. Int'l Bus. Machines Corp*., 2012 WL 3277136, at *18 (N.D. Cal. Aug. 9, 2012)). As discussed below, the likelihood of confusion standard is not satisfied as a matter of law because there are genuine issues of material fact as to several of the *Sleekcraft* factors. As a result, this factor cannot be applied in connection with the Peloton Motion. Similarly, there are genuine disputes of fact as to whether Peloton and Move Press compete. Accordingly, the fifth factor cannot be weighed in connection with the Peloton Motion.

The fourth factor, which is good faith ignorance, focuses on whether Peloton had prior knowledge of Move Press when it decided to adopt the mark PELOTON. *See Fitbug*, 78 F.Supp.3d at 1194 (citing *Internet Specialties W., Inc. v. ISPWest*, 2006 WL 4568073, at *4 (C.D. Cal. Nov. 14, 2006), aff'd

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV18-01686 JAK (RAOx) | Date | September 5, 2019 |
|---|---|---|---|
| Title | Move Press, LLC v. Peloton Interactive, Inc. | | |

*Internet Specialties*, 559 F.3d 985 (9th Cir. 2008)). Move Press argues that Peloton did not act in good faith because Peloton knew about Move Press's PELOTON magazine as early as 2012. Dkt. 63 at 9. In support of this position, Move Press relies on the e-mail Carolyn Foley sent to John Foley, Peloton's founder and Chief Executive Officer, on August 18, 2012. It stated, "Just saw at my grocery store the magazine Peloton." Lang Decl., Dkt. 44-1 (Ex. 48). Although this provides some evidence as to Peloton's awareness of the existence of Move Press in 2012 prior to announcing or selling its products, there are undisputed facts showing that Peloton selected the name PELOTON before it was aware of Move Press. According to Peloton, Foley came up with the name PELOTON in 2011 and formed the company in January 2012. Foley Decl. ¶ 7, Dkt. 38 at 3; DSUF ¶ 51. It is undisputed that when Foley chose the name PELOTON, neither he nor his co-founders was aware of Move Press. DSUF ¶ 53. Thus, the undisputed facts show Peloton chose its mark in 2011 before it first learned of Move Press on August 18, 2012. This factor weighs in Peloton's favor.

The final factor concerns the extent of harm Peloton will suffer as a result of Move Press's delay. "[A] defendant can make the required showing of prejudice by proving that it has continued to build a valuable business around its trademark during the time that the plaintiff delayed the exercise of its legal rights." *Grupo Gigante*, 391 F.3d at 1105. During the years Move Press delayed bringing this action, Peloton has become one of the leading fitness companies under its PELOTON brand. DSUF ¶ 74. Since 2013, Peloton has invested millions of dollars in its brand, has grown its workforce substantially, and continues to open PELOTON-branded retail showrooms across the United States. *Id*. ¶¶ 78-79, 81. Further, Peloton has received numerous awards and widespread media coverage. *Id*. ¶ 83. As a result, Peloton has developed substantial good will and recognition in the fitness market. *Id*. ¶ 84. Based on this evidence, the prejudice would be substantial if Peloton were to lose the rights to the PELOTON name.

Even without weighing the third and fifth factors, a consideration of the four other ones shows that they weigh heavily in favor of Peloton. Accordingly, there is no triable issue as to whether the delay by Move Press was unreasonable.

        d)      Prejudice to Peloton

"Even where a defendant establishes that a plaintiff delayed unreasonably in filing suit, laches will not bar a claim unless that delay prejudiced the defendant." *Eat Right Foods*, 880 F.3d at 1119 (citing *Grand Canyon Trust v. Tucson Elec. Power Co.*, 391 F.3d 979, 988 (9th Cir. 2004)). Two types of prejudice can give rise to laches: "expectations-based prejudice and evidentiary prejudice." *Id*. Peloton maintains that the undisputed evidence shows Peloton will suffer prejudice from Move Press's unreasonable delay. Dkt. 36 at 25.

Expectations-based prejudice exists where "a defendant 'took actions or suffered consequences that it would not have, had the plaintiff brought suit promptly.'" *Evergreen,* 697 F.3d at 1227 (quoting *Danjaq*, 263 F.3d at 955). A defendant can establish prejudice by demonstrating that, during the plaintiff's delay, "it invested money to expand its business or entered into business transactions based on [its] presumed rights" in a disputed mark. *Eat Right Foods*, 880 F.3d at 1119 (quoting *Miller v. Glenn Miller Prods., Inc.*, 454 F.3d 975, 999 (9th Cir. 2006). Here, as of 2013, Peloton invested more than $180 million in promoting its PELOTON brand and $30 million in researching and developing new products to offer under its PELOTON mark. DSUF ¶¶ 81-82. Peloton has made these investments based on its

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV18-01686 JAK (RAOx) | Date | September 5, 2019 |
|---|---|---|---|
| Title | Move Press, LLC v. Peloton Interactive, Inc. | | |

presumed rights in its PELOTON mark. In addition, Peloton has grown its workforce substantially and has opened approximately 70 retail showrooms across the United States. These undisputed facts show that there is substantial expectations-based prejudice.

Additionally, "at least some reliance on the absence of a lawsuit" is necessary to show prejudice. *Seller Agency Council, Inc. v. Kennedy Ctr. for Real Estate Educ., Inc.*, 621 F.3d 981, 989 (9th Cir. 2010). This determination focuses on whether Peloton "would have acted differently had [Move Press] filed suit earlier." *Eat Right II*, 2019 WL 3408896, at *2. When Peloton filed its trademark application for PELOTON, the PTO initially rejected it, citing Schwinn's PELOTON registration for outdoor bicycles. Foley Decl. ¶¶ 16, 21. Thereafter, Peloton contacted Schwinn, which led to an agreement between the two that allowed Schwinn to maintain its registration for its mark for its outdoor bicycle while allowing Peloton to use the mark in connection with home fitness products and services. *Id*. ¶ 17, Ex. 6. The PTO then approved Peloton's amended application. *Id*. ¶ 22. This evidence supports an inference that Peloton would have acted differently had Move Press challenged Peloton's use of the PELOTON mark when Peloton filed its trademark application. Thus, it shows that Peloton would have been amenable to seeking to seeking an agreement with Move Press. Furthermore, Move Press's failure to respond to Peloton's letter rejecting Move Press's infringement claims until it brought this action three and a half years later (DSUF ¶ 23), reflects that Peloton acted in "reliance on the absence of a lawsuit" in continuing to use its PELOTON mark.

Accordingly, the undisputed evidence shows that the delay in the commencement of this action prejudiced Peloton.

e) Willful Infringement Defense to Laches

Move Press argues Peloton's willful infringement bars the application of the laches defense. In *Danjaq LLC v. Sony Corp.*, the Ninth Circuit held that the definition of willful infringement under the Copyright Act -- infringement that occurs "'with knowledge that the defendant's conduct constitutes copyright infringement'" -- is the standard by which courts should assess whether willful infringement bars the application of laches. 263 F.3d at 957 (quoting *Columbia Pictures Television v. Krypton Broad.*, 106 F.3d 284, 293 (9th Cir.1997) (alterations and omissions in original) rev'd on other grounds sub nom. *Feltner v. Columbia Pictures Television*, 523 U.S. 340 (1998)). District courts in the Ninth Circuit have applied this standard to trademark infringement, and the parties do not dispute that it applies here. *See Fitbug*, 78 F. Supp. 3d at 1195; *FLIR Sys. Inc. v. Sierra Media, Inc.*, 965 F.Supp.2d 1184, 1210 (D. Or. 2013).

The analysis of the Move Press Motion, which is set forth below, determines that there are triable issues of fact as to whether Peloton infringed Move Press's trademark, including as to willful infringement. Assuming, *arguendo*, that Move Press can show infringement, the present record is insufficient as to "willful infringement." *Danjaq*, 263 F.3d at 958. Although it is undisputed that Peloton learned about Move Press prior to announcing or selling its products in 2013, in the bad faith infringement context numerous courts have found that "[p]rior knowledge of a senior user's trademark does not necessarily give rise to an inference of bad faith and may be consistent with good faith." *Fitbug*, 78 F.Supp.3d 1193-94 (citing *Arrow Fastener Co. v. Stanley Works*, 59 F.3d 384, 397 (2d Cir.1995). Move Press suggests that bad faith should be inferred here because Peloton "knew it would infringe but used PELOTON because it did not care about Move Press's rights" and "fail[ed] to stop

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV18-01686 JAK (RAOx) | Date | September 5, 2019 |
|---|---|---|---|
| Title | Move Press, LLC v. Peloton Interactive, Inc. | | |

using PELOTON after receiving a letter from Move Press's attorney in 2014." Dkt. 63 at 2-3.

There is no evidence that Peloton was aware of Move Press's mark at the time it chose the Peloton name in 2011. Instead, the record demonstrates that Peloton first learned about Move Press in August 2012. This was after Peloton chose the name "Peloton," but before it announced or began marketing its products under that name in 2013. Although Peloton was aware of Move Press prior to announcing or marketing its products, Move Press has not presented any evidence disputing Peloton's asserted good faith belief that its use has not been infringing. Nor has it presented evidence of wrongful intent to capitalize on Move Press's goodwill. On the contrary, it is undisputed that, at the time Foley learned of Move Press, he believed there was no likelihood of confusion between PELOTON Magazine and Peloton's goods and services. Foley Decl. ¶ 41. As the Ninth Circuit has recognized, citing approvingly a case from the Sixth Circuit, "a knowing use in the belief that there is no confusion is not bad faith." *Lindy Pen Co., Inc. v. Bic Pen Corp.*, 982 F.2d 1400, 1406 (9th Cir.1993) (citing *Nalpac, Ltd. v. Corning Glass Works*, 784 F.2d 752, 755 (6th Cir.1986)).

That Peloton continued to use the PELOTON mark and name after receiving Move Press's cease and desist letter does not show bad faith per se. Peloton responded to Move Press's letter on July 21, 2014, rejected Move Press's claims and concluded by stating "[w]e trust that this resolves the matter; however, if you have questions, please contact the undersigned." DSUF ¶ 23. Move Press did not contact Peloton before it filed this action three and a half years later. *Id*. ¶ 24. By failing to respond to Peloton's response letter, Move Press reinforced Peloton's belief that it was not infringing on the Move Press mark.

For these reasons, there is not a triable issue as to whether alleged willful infringement bars the application of the laches defense. For the foregoing reasons, the Peloton Motion is **GRANTED**. Because Move Press's claims are time-barred, the Move Press Motion is **DENIED** as moot. Notwithstanding that outcome, in light of the procedural setting of this action, the merits of the Move Press Motion are next addressed.

    B.    Move Press's Motion for Summary Judgment

        1.    <u>Legal Standard</u>

To establish trademark infringement, a plaintiff must demonstrate that (1) its mark is valid; (2) it is the senior mark; and (3) the defendant's mark is likely to cause confusion in the marketplace. *Brookfield Communications, Inc. v. West Coast Entertainment Corp.*, 174 F.3d 1036, 1046 (9th Cir.1999). To establish common law trademark rights in the absence of federal registration, a plaintiff must plead and prove that it is the senior user of the mark with sufficient market penetration to preclude the defendant from using the mark in a specific geographic market. *See Sengoku Works Ltd. v. RMC Int'l, Ltd.*, 96 F.3d 1217, 1219 (9th Cir.1996) ("To acquire ownership of a trademark it is not enough to have invented the mark first or even to have registered it first; the party claiming ownership must have been the first to actually use the mark in the sale of goods or services."); *Credit One Corp. v. Credit One Fin., Inc.*, 661 F.Supp.2d 1134, 1138 (C.D. Cal. 2009) ("A party asserting common law rights must not only establish that it is the senior user, it must also show that it has 'legally sufficient market penetration' in a certain geographic market to establish those trademark rights.")

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV18-01686 JAK (RAOx) | Date | September 5, 2019 |
|---|---|---|---|
| Title | Move Press, LLC v. Peloton Interactive, Inc. | | |

    2.    <u>Application</u>

        a)    Ownership of a Valid, Protectable Mark

Move Press claims nationwide common law rights in the PELOTON mark that predate Peloton's use of the mark. Dkt. 48 at 5. In response, Peloton argues Move Press cannot establish priority over Peloton because Move Press has failed to provide sufficient evidence to prove market penetration in all 50 states. In addition, Peloton argues that there is a genuine issue of material fact as to whether Move Press's use of the PELOTON mark predated Peloton's November 2012 federal registration.

"It is axiomatic in trademark law that the standard test of ownership is priority of use." *Sengoku*, 96 F.3d at 1219. When proving ownership, "[f]ederal registration of a trademark constitutes prima facie evidence of the validity of the registered mark and of [the registrant's] exclusive right to use the mark' in commerce." *Quiksilver, Inc. v. Kymsta Corp.*, 466 F.3d 749, 755 (9th Cir.2006) (quoting *Brookfield*, 174 F.3d at 1047. Peloton registered its PELOTON mark with the PTO through an application filed on November 9, 2012. Therefore, it is entitled to a presumption of ownership as of that date.[3] *See Sengoku*, 96 F.3d at 1219 ("the registrant is granted a presumption of ownership, dating to the filing date of the application for federal registration"); *Rolley, Inc. v. Younghusband*, 204 F.2d 209, 211 (9th Cir.1953) ("Upon registration the presumption as to date of first use by the registrant has been held to extend back to the filing date").

Move Press "can rebut this presumption by showing that … [Move Press] used the mark in commerce first." *Sengoku*, 96 F.3d at 1220. Move Press asserts that it has used its PELOTON mark in the United States since 2011, when it distributed the first issue of the PELOTON magazine. According to Move Press, by the end of 2011, 25,000 print copies had been distributed nationwide and Move Press had 15,000 digital subscribers. Roe Decl. ¶ 7 (Dkt. 45). In support of this assertion, Move Press cites Roe's declaration and the corresponding exhibits, which include copies of the 2014 edition of the magazine. Move Press also relies on statements by Foley's mother about seeing a copy of the PELOTON magazine in a grocery store in Texas.

This evidence is insufficient to establish the absence of a triable issue of fact as to whether Move Press is "the senior user of the [PELOTON] mark with sufficient [nationwide] market penetration to preclude [Peloton] from using the mark in a specific geographic market." *Sengoku*, 96 F.3d at 1219. Although seniority of use does not require "evidence of actual sales," *Rearden LLC v. Rearden Commerce*, 683 F.3d 1190, 1205 (9th Cir. 2012), use of the mark must be "sufficiently public" so that the public associates the mark with the "adopter of the mark." *Glow Indus. v. Lopez*, 252 F.Supp.2d 962, 983 (C.D. Cal. 2002). In making this determination, a court may rely on the use and promotion of the mark

---

[3] On September 7, 2010, Move Press filed its first application for registration of its PELOTON mark. Lang Decl. (Ex. 25). On December 16, 2010, the PTO refused Move Press's registration finding that it was merely descriptive of the Move Press magazine. Move Press then requested registration on the Supplemental Register. Wakefield Decl., Dkt. 37-21 (Ex. 18). The PTO granted this request and issued the mark on the Supplemental Register on July 19, 2011. PSUF 33; Registration No. 3,999,969. Registration of the mark on the Supplemental Register does not constitute "prima facie evidence of the validity of the registered mark [or] of the registration of the mark, of the owner's ownership of the mark, [or] of the owner's exclusive right to use the registered mark in commerce on or in connection with the goods or services specified in the certificate...." 15 U.S.C. §§ 1057(b); 1094. Accordingly, Move Press cannot assert priority based on the July 19, 2011 registration.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV18-01686 JAK (RAOx) | Date | September 5, 2019 |
|---|---|---|---|
| Title | Move Press, LLC v. Peloton Interactive, Inc. | | |

in advertising brochures, catalogs, newspaper advertisements, and articles in newspapers and trade publications, as well as on television and radio. *Id*.

The claim by Move Press that it began using the PELOTON mark in 2011 is supported only by Roe's declaration. The evidence attached to it includes copies of the PELOTON magazines that were distributed in 2014, not 2011. Moreover, the internal email detailing Move Press's promotional reach is dated December 7, 2010. Lang Decl., Dkt. 45-37 (Ex. 14). This does not show the absence of a triable issue of fact as to whether Move Press's use of the PELOTON mark was "sufficiently public" as of 2011.

Assuming, *arguendo*, Move Press had shown the absence of a triable issue as to its qualification as the senior user, Move Press has not established the absence of a triable issue as to sufficient market penetration to assert nationwide rights over the PELOTON mark. "[T]he senior user of a mark is entitled to assert trademark rights in all areas in which it has legally sufficient market penetration. This is determined by examining the trademark user's volume of sales and growth trends, the number of persons buying the trademarked product in relation to the number of potential purchasers, and the amount of advertising." *Glow Indus*., 252 F.Supp.2d at 983.

Once again, Move Press relies only on the Roe declaration in an effort to show that there is not a triable issue as to whether Move Press had legally sufficient, national market penetration. This evidence is insufficient; it does not include anything about the actual location of its subscribers or the actual sales in each state. *Glow Indus*., 252 F.Supp.2d at 984 (no market penetration shown because the plaintiff had presented no evidence of the "volume or level of sales in any location, nor how [the plaintiff's] market penetration compares with that of competitors"). Moreover, the claim that it has national online recognition sufficient to show the absence of a triable issue as to nationwide market penetration is unpersuasive because Move Press did not identify the states of residence of any of its alleged digital subscribers. *Optimal Pets, Inc. v. Nutri–Vet*, LLC, 877 F.Supp.2d 953, 962 (C.D.Cal.2012) ("Thus, a sale to a customer through the internet will be considered a sale in the geographic area in which the customer is located.")

        b)     Likelihood of Confusion

"[T]he critical determination [on a trademark infringement claim] is whether an alleged trademark infringer's use of a mark creates a likelihood that the consuming public will be confused as to who makes what product." *Jada Toys, Inc. v. Mattel, Inc*., 518 F.3d 628, 632 (9th Cir. 2008) (internal quotations and citations omitted). In a reverse confusion case, such as this, "[t]he question...is whether consumers doing business with the senior user might mistakenly believe that they are dealing with the junior user." *Dreamwerks Prod. Group, Inc. v. SKG Studio*, 142 F.3d 1127, 1130 (9th Cir.1998).

The Ninth Circuit has adopted the eight-factor *Sleekcraft* test for determining whether a likelihood of confusion has been shown. See *AMF, Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348 (9th Cir. 1979). The factors are: (1) the strength of the plaintiff's mark; (2) the relatedness or proximity of the goods; (3) the similarity of the marks; (4) evidence of actual confusion; (5) the degree to which the parties' marketing channels converge; (6) the type of goods and degree of care purchasers are likely to exercise in selecting the goods; (7) evidence of the defendant's intent; and (8) the likelihood that the parties will expand their product lines. *Id*.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| | | | |
|---|---|---|---|
| Case No. | LA CV18-01686 JAK (RAOx) | Date | September 5, 2019 |
| Title | Move Press, LLC v. Peloton Interactive, Inc. | | |

(1)  <u>Strength of the Mark</u>

"'The stronger a mark—meaning the more likely it is to be remembered and associated in the public mind with the mark's owner—the greater the protection it is accorded by the trademark laws.'" *Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, 1149 (9th Cir. 2011). In assessing the strength of a mark, a court must analyze both its "conceptual" and "commercial" strength. *Id*. Conceptual strength involves classifying the mark on the spectrum of distinctiveness, while commercial strength is based on "'actual marketplace recognition,' " including advertising expenditures. *Id*.; *see also Glow*, 252 F.Supp.2d at 989 (noting that commercial strength is evaluated in light of "any advertising or marketing campaign by the junior user that has resulted in 'a saturation in the public awareness of the junior user's mark.'"). In reverse confusion cases, a court evaluates the conceptual strength of the senior user. However, for commercial strength, "the focus is on the relative strengths of the marks so as to gauge the ability of the junior user's marks to overcome the senior user's mark. *Boldface Licensing %8F Branding v. By Lee Tillett, Inc.,* 940 F. Supp. 2d 1178, 1189 (C.D. Cal. 2013)

Similarly, marks are "conceptually classified along a spectrum of generally increasing inherent distinctiveness as generic, descriptive, suggestive, arbitrary, or fanciful." *Brookfield*, 174 F.3d at 1058. Move Press argues that its PELOTON mark is conceptually strong because it is suggestive. Peloton responds that Move Press's PELOTON mark is "merely descriptive for the content of Move Press's cycling magazine and related products." Dkt. 56 at 14. Even if the Move Press mark is suggestive, "suggestive marks are presumptively weak." *Brookfield*, 174 F.3d at 1058. Thus, Move Press has acknowledged that its PELOTON mark is conceptually weak. This is confirmed because Move Press coexists with several other PELOTON-related marks in the cycling market.[4]  *See Glow Indus.*, 252 F.Supp.2d at 990–92 (citing cases in which substantial, non-party use of a term caused an inherently distinctive mark to be considered weak). For these reasons, the Move Press PELOTON mark is conceptually weak.

The next issue is the comparative commercial strength of the two marks. Although there is evidence that the Move Press PELOTON mark has some commercial strength, there is competing evidence that reflects that the Peloton mark is substantial stronger. The first issue of Move Press's PELOTON magazine was distributed and sold in Barnes & Noble stores in early 2011. By mid-2011 the PELOTON magazine was available for purchase in supermarkets throughout the country. Roe Decl. ¶ 7, Dkt. 45. By the end of 2011, 25,000 print copies of the magazine had been distributed, and Move Press had 15,000 digital subscribers. *Id*. In 2018, Move Press distributed 12,000 printed copies and the number of digital subscribers dropped to 7000. Id. During the eight years that Move Press has been in business, it has spent $322,000 on advertising and has generated approximately one billion online responses to its social media content. DSUF ¶ 34; Roe Decl. ¶ 6. This evidence reflects that there is a reasonable probability that readers of fitness magazines and cycling enthusiasts would recognize Move Press's PELOTON magazine and website.

The evidence also supports a reasonable inference that Peloton has a substantially greater market

---

[4]  These other marks include "Peloton Sports, Peloton Cycles, Red Peloton, ProPeloton Cyclery, DailyPeloton.com, Garage Peloton, Peloton Riders for Christ, Peloton Station, a Peloton cycling game, a Peloton bike rack, and a Peloton road bike." *See* Dkt. 56 at 14.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV18-01686 JAK (RAOx) | Date | September 5, 2019 |
|---|---|---|---|
| Title | Move Press, LLC v. Peloton Interactive, Inc. | | |

presence. Since 2013, Peloton has spent more than $180 million in advertising and marketing its PELOTON marks on television, social media, direct mailings and billboards. DSUF ¶ 81. Peloton has sold more than 360,000 indoor exercise bicycles and has over 300,000 subscribers. *Id*. ¶ 75. Peloton continues to sell its products both online and in approximately 70 retail locations across the United States, United Kingdom and Canada that have PELOTON branded retail showrooms. *Id*. ¶ 79. In light of these undisputed facts, Peloton's "ability to saturate the marketplace creates a potential that consumers will assume that [Move Press's] mark refers to [Peloton], and thus perceive that the businesses are somehow associated." *Cohn v. Petsmart, Inc*., 281 F.3d 837, 842 (9th Cir. 2002) (per curiam).

Based on the relative conceptual weakness of Move Press's PELOTON mark and Peloton's substantial commercial strength, a reasonable consumer could believe that Move Press is sponsored by or affiliated with Peloton. Therefore, the strength of the mark factor favors Move Press.

(2) <u>Relatedness and Proximity of the Goods</u>

"Related goods are generally more likely than unrelated goods to confuse the public as to the producers of the goods." *Brookfield*, 174 F.3d at 1055. "The standard for deciding whether the parties' goods or services are 'related' is whether customers are likely to associate the two product lines." *Surfvivor Media, Inc. v. Survivor Prods*., 406 F.3d 625, 634 (9th Cir. 2005) (internal quotation omitted). Also relevant is "whether the buying public could reasonably conclude that the products came from the same source." *Id*. Thus, "[t]he proximity of goods is measured by whether the products are: (1) complementary; (2) sold to the same class of purchasers; and (3) similar in use and function." *Network Automation*, 638 F.3d at 1150.

Move Press contends that its print and digital magazines, social media, videos, mobile apps, clothing and articles covering lifestyle are complementary to Peloton's stationary bicycles and streaming fitness classes. Dkt. 48 at 24. In support of this contention, Move Press argues that Peloton sells the same goods that are advertised in the Move Press PELOTON magazine. Move Press further contends that Peloton directly competes with Move Press because both companies target outdoor cyclists and create films, advertise through social media, have a phone app, stream videos and sell clothing. *Id*. at 15. In response, Peloton asserts that its exercise bicycle and streaming group fitness classes are not complementary to Move Press's PELOTON magazine because Peloton is a home fitness business and Move Press's magazine emphasizes outdoor cycling. Further, Peloton argues it does not compete with Move Press because its video content and mobile application relate to streaming group fitness classes while the mobile application offered by Move Press is a means to access digital versions of its magazine. Dkt. 56 at 17.

The Ninth Circuit has made clear that "the relatedness of each company's prime directive isn't relevant." *Dreamwerks*, 142 F.3d at 1131. Instead, the question is whether the consuming public is likely to associate Peloton's products with Move Press. *Brookfield*, 174 F.3d at 1056. Here, both companies offer products and services related to the cycling and fitness industry under their respective PELOTON marks. However, "the mere fact that two products or services fall within the same general field ... does not mean that the two products or services are sufficiently similar to create a likelihood of confusion." *Matrix Motor Co. v. Toyota Jidosha Kabushiki Kaisha*, 290 F. Supp. 2d 1083, 1092 (C.D. Cal. 2003). The evidence shows that there are triable issues as to whether consumers are likely to associate the

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| | | | |
|---|---|---|---|
| Case No. | LA CV18-01686 JAK (RAOx) | Date | September 5, 2019 |
| Title | Move Press, LLC v. Peloton Interactive, Inc. | | |

Move Press magazine with Peloton's fitness business.

(3) <u>Similarity of the Marks</u>

"Similarity of the marks 'has always been considered a critical question in the likelihood-of-confusion analysis.'" *JL Beverage Co. v. Jim Beam Brands Co.*, 828 F.3d 1098, 1109 (9th Cir. 2016) (quoting *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1205 (9th Cir. 2000)). "Similarity of the marks is tested on three levels: sight, sound, and meaning." *Sleekcraft*, 599 F.2d at 351. "Each must be considered as they are encountered in the marketplace." *Id*. "Although similarity is measured by the marks as entities, similarities weigh more heavily than differences." *Id*.

Move Press presents the conclusory argument that "this factor favors Move Press because both parties use the identical mark PELOTON." Dkt. 48 at 17. However, the issue must be considered in light of how the two PELOTON marks are presented to consumers in the market. Here, it is undisputed that, because the marks have the same word, when spoken, the two have the same sound. This undisputed fact provides some weight for the claim of Move Press.

In evaluating the visual appearance of the marks, Move Press's mark has changed over the years. In 2015, Move Press used its PELOTON mark in a serif font in all lowercase letters. The mark was underlined with the caption "fuel the ride" beneath it. When Move Press filed this action, the mark was used in a non-serif font and in all capital letters. At all times, the Move Press mark was featured in a black and white color format and was often preceded by "Move Press" and followed by "Magazine."

Peloton uses its PELOTON mark in a san serif font in all capital letters. It frequently does so in conjunction with its trademarked *"P"* logo in bright red.

A likelihood of confusion may be mitigated when "the name of the company invariably accompanied the [trademarked] slogan." *Cohn*, 281 F.3d at 842 (quoting *Norm Thompson Outfitters, Inc. v. General Motors Corp.*, 448 F.2d 1293, 1298 (9th Cir. 1971)). The visual differences between the two marks are sufficient to create a triable issue of fact on this factor. Thus, they are ones on which a reasonable jury could rely to find that Peloton's use of PELOTON is dissimilar to the use of the mark by Move Press. *See Americana Trading Inc. v. Russ Berrie & Co.*, 966 F.2d 1284, 1288 (9th Cir. 1992) (the role of prominence of house trademark in confusion determination is a jury question).

Finally, a reasonable juror could find that the parties', respective PELOTON marks have different meanings. *Merriam-Webster* defines "peloton" as "the main body of riders in a bicycle race."[5] However, Move Press uses its PELOTON mark together with the term "Magazine." A reasonable interpretation of this includes a publication about bicycle races. Peloton uses its PELOTON mark alone or with its logo in connection with its home fitness products and services, not road cycling. Peloton chose the name PELOTON "as sort of a metaphor, in that [Peloton's] customers would gain performance benefits from working out in a virtual group setting." Foley Decl. ¶ 8.

This evidence shows that there is a triable issue as to whether the marks have different meanings to the expected audiences. *See Entrepreneur Media*, 279 F.3d at 1146. Therefore, there is also a triable

---

[5] https://www.merriam-webster.com/dictionary/peloton

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV18-01686 JAK (RAOx) | Date | September 5, 2019 |
|---|---|---|---|
| Title | Move Press, LLC v. Peloton Interactive, Inc. | | |

issue as to the similarity of the parties' marks.

(4) <u>Actual Confusion</u>

"[E]vidence of actual confusion, at least on the part of an appreciable portion of the actual consuming public, constitutes strong support for a 'likelihood of confusion' finding." *Rearden*, 683 F.3d at 1210 (emphasis added); *see also Japan Telecom, Inc. v. Japan Telecom Am. Inc.*, 287 F.3d 866, 874 (9th Cir.2002) (party must put forth "persuasive evidence that a significant number of consumers have formed a similar mental association" to demonstrate actual confusion). However, the absence of evidence of actual confusion is generally not material because actual confusion is hard to prove. *Brookfield*, 174 F.3d at 1050.

Move Press cites nine examples of consumer confusion in an effort to show there has been actual confusion in the marketplace:

- On April 20, 2018, a twitter user identified as "@STSprogram" tweeted "Look what finally arrived @onepeloton @pelotonmagazine #ilovemypelotonbike #safetrainingstrategy #rideNYC" (Ex. 22)

- Twitter user "@ergomorphis" tweeted "@onepeloton @PelotonWatch @pelotonmagazine Is it time to add another #cycle #fitness? #peloton #treadmill #CES #CES18 @CES"

- On March 7, 2018, in re-tweeting "@RealHughJackman"'s post about Peloton, twitter user "@OrlyLobel" wrote "Hugh giving all the rest of us in the #Peloton family goals to aspire to @onepeloton @pelotonmagazine though I bet he doesn't have near 500 @classpass classes yet!"

- On April 5, 2018, in replying to Move Press's January 21, 2014 tweet "Follow us for cycling news, photos, features and RT's of intrigue," a twitter user identified as "SniprFire1" wrote "I think I will pass.. You pulled your ads from @Hannity #diseasedLiberals don't get my $$$$"

- On September 28, 2018, twitter user "@RevRico" posted "Stay away from Peloton spin bikes … worst customer service ever @pelotonmagazine #peloton #spinning @PelotonBikes Paid for now two weeks with no show appointments…. shop elsewhere"

- In August 2018, Patti Pelton sent an e-mail to Move Press employee Ben Edwards. It stated that she wanted to feature a Peloton spin bicycle on a show. Ben Edwards responded, "I'm with PELOTON Magazine, not PELOTON cycle, the indoor cycling company – is that who you are trying to reach? It's a constant source of confusion unfortunately. If you do want PELOTON Magazine, I can take care of you, but I garnered from your voice mail you're looking for the indoor spin bike." (Ex. 23)

- In April 2018, Move Press arranged with the FCA Group to review an Alfa Romeo Stelvio for PELOTON Magazine. When the vehicle was delivered to Move Press's offices, Berj Alexanian, a Group manager at FCA, set Roe a personal note stating, "My coworker just took delivery of a new Peloton bike today." (Roe Decl. 17)

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV18-01686 JAK (RAOx) | Date | September 5, 2019 |
|---|---|---|---|
| Title | Move Press, LLC v. Peloton Interactive, Inc. | | |

- Roe declares that, at a cycling event in San Diego, the owner of a cycling industry insurance agency, "Life CS Agency," asked Roe about PELOTON Magazine's affiliation with the PELOTON bicycle and whether Peloton paid Move Press a licensing fee to use PELOTON (Roe Decl. 18)

- In 2016, WME/IMG approached Move Press to discuss Move Press providing PELOTON-branded cycling packages and global live racing in the North American markets. While on a call, WME/IMG executives states they believed Move Press was affiliated with Peloton. When Roe told them there was no affiliation, the WMG/IMG executives ended the meeting and did not hire Move Press to provide a subscription-based live cycling package. Roe Decl. 19.

The five tweets in which Move Press's account @pelotonmagazine was tagged do not establish that there is not a triable issue as to whether a material number of consumers have been confused by the two marks. Given that the two marks have been in the market for more than four years and that both parties use Twitter, "a handful of examples of anecdotal confusion are insufficient to support a finding confusion." *Stonefire Grill, Inc. v. FGF Brands, Inc*., 987 F. Supp. 2d 1023, 1054 (C.D. Cal. 2013). Further, insolated, unauthenticated web postings are insufficient to show actual confusion. *Network Automation, Inc. v. Hewlett-Packard Co*., 2009 WL 5908719, at *10 (C.D. Cal. Sept. 14, 2009). The four other examples of potential confusion are insufficient to show the absence of a triable issue because Move Press must show "persuasive evidence that a *significant* number of consumers have formed a similar mental association" to demonstrate actual confusion. *Japan Telecom, Inc*., 287 F.3d at 874 (emphasis added). Four instances of potential confusion are not sufficient to meet this standard in the context of a motion for summary judgment. Move Press has not offered any survey or expert report demonstrating a significant level of actual confusion. Accordingly, for purposes of the present proceedings, there is a triable issue as to actual confusion..

(5)     Marketing Channels

"Convergent marketing channels increase the likelihood of confusion." *Sleekcraft*, 599 F.2d at 353. To assess convergence, "courts consider whether the parties' customer bases overlap and how the parties advertise and market their products." *Pom Wonderful*, 775 F.3d at 1130. Move Press argues this factor weighs in its favor because both parties have strong social media presences, transmit newsletters and sell clothing on the Internet, and advertise at the same events, including at the Tour de France. In response, Peloton maintains that "the parties' marketing channels share nothing beyond use of the Internet and a single sporting event." Dkt. 56 at 22.

The Ninth Circuit has rejected the claim that the "marketing channels" factor can favor a plaintiff simply because both parties advertise over the Internet. "Given the broad use of the Internet today, the same could be said for countless companies. Thus, this factor merits little weight." *Playboy*, 354 F.3d at 1028; *Network Automation*, 638 F.3d at 1151 ("it would be the rare commercial retailer that did not advertise online, and the shared use of a ubiquitous marketing channel does not shed much light on the likelihood of consumer confusion.") Further, that the parties both advertise at the Tour de France is not sufficient to tip the scale, given that the Tour de France is only one marketing channel among many for both parties. *See Oculu, LLC v. Oculus VR, Inc*., 2015 WL 3619204, at *17 (C.D. Cal. June 8, 2015) (attendance by the parties at one investor networking event is not sufficient for this factor to weigh in plaintiff's favor).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| | | | |
|---|---|---|---|
| Case No. | LA CV18-01686 JAK (RAOx) | Date | September 5, 2019 |
| Title | Move Press, LLC v. Peloton Interactive, Inc. | | |

In the context of the Move Press Motion, this factor weighs against a finding of likelihood of confusion.

(6)   Degree of Care Purchasers Exercise

"In analyzing the degree of care that a consumer might exercise in purchasing the parties' goods, the question is whether a 'reasonably prudent consumer' would take the time to distinguish between the two product lines." *Surfvivor*, 406 F.3d at 634. When a buyer has expertise in the field or when the good or service is expensive, buyers are likely to exercise a higher standard of care. This reduces the likelihood of confusion, but does not eliminate the risk entirely. *Sleekcraft*, 599 F.2d at 353.

Move Press argues that its customers are unsophisticated about the features and qualities of its goods. Dkt. 48 at 19. However, in his sworn declaration, Roe states that its magazine "is trying to reach a high-end cycling male-dominated base of consumers" with an "average household income of 175 [thousand]" who are "highly-educated." Declaration of Eric Ball ("Ball Decl."), Dkt. 58-1 (Ex. 1) at 245:10-19. Therefore, Move Press admits that it targets some consumers who are likely to have expertise in cycling, and who would be likely to exercise a higher degree of care. Similarly, it is likely that Peloton's customers exercise a higher standard of care when deciding whether to spend $2000 on an exercise bicycle or $4,000 on a treadmill.

Because there is a triable issue of fact as to this factor, this weighs against granting the Move Press Motion.
.

(7)   Peloton's Intent in Selecting its Mark

A party claiming trademark infringement need not prove that the alleged infringing party intended to deceive consumers or other users because intent is not a necessary element of trademark infringement. *Official Airline Guides, Inc. v. Goss*, 6 F.3d 1385, 1393 (9th Cir. 1993). Accordingly, the Ninth Circuit has "emphasized the minimal importance of the intent factor" in the likelihood of confusion analysis. *GoTo.com, Inc.*, 202 F.3d at 1208 (declining to consider this factor). However, the intent factor may be "relevant to the extent that it bears upon the likelihood that consumers will be confused by the alleged infringer's mark." *Brookfield*, 174 F.3d at 1059 (citing *Sleekcraft*, 599 F.2d at 348 n.10).

*Marketquest Grp., Inc. v. BIC Corp.*, 862 F.3d 927, 934 (9th Cir. 2017), addressed the proper inquiry of this factor in a reverse confusion case:

> when a court applies *Sleekcraft* in a case that presents reverse confusion, and the intent factor is relevant, it may consider several indicia of intent. At one extreme, intent could be shown through evidence that a defendant deliberately intended to push the plaintiff out of the market by flooding the market with advertising to create reverse confusion … Intent could also be shown by evidence that, for example, the defendant knew of the mark, should have known of the mark, intended to copy the plaintiff, failed to conduct a reasonably adequate trademark search, or otherwise culpably disregarded the risk of reverse confusion … The tenor of the intent inquiry shifts when considering reverse confusion due to the shift in the theory of confusion, but no specific type of evidence is necessary to establish intent, and the importance of intent and evidence presented will

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| | | | |
|---|---|---|---|
| Case No. | LA CV18-01686 JAK (RAOx) | Date | September 5, 2019 |
| Title | Move Press, LLC v. Peloton Interactive, Inc. | | |

vary by case.

*Id*. at 934-35 (citations omitted).

The parties dispute whether Peloton intended to infringe the PELOTON mark. Move Press contends that Peloton adopted its PELOTON mark in bad faith because it had actual knowledge of Move Press's PELOTON mark on August 18, 2012. Dkt. 48 at 21; Lang Decl., Dkt. 44-1 (Ex. 49). This argument is without merit. It is undisputed that Foley chose the name PELOTON in 2011 and began using PELOTON as its brand name in January 2012. Based on the evidence presented in connection with the present motions, this was eight months before Peloton learned of Move Press. Foley Decl. ¶ 9. Move Press also contends that Peloton's continued use of PELOTON after receiving Move Press's cease and desist letter shows Peloton's bad faith. *Id*.

Move Press has not identified particularized evidence regarding Peloton's intent to push Move Press out of the market or purposefully to disregard the risk of reverse confusion. Move Press instead relies on excerpts of Foley's deposition testimony that, when read in context, do not show the absence of a triable issue as to bad faith. Foley's declaration states that when he selected the name PELOTON, his team searched for uses of "Peloton" as a name or trademark in the PTO's database and on Google. Foley Decl. ¶ 10. Peloton discovered several companies that were using "Peloton" as their brand name or in connection with their products and services, but none of them used "Peloton" for interactive home fitness products. Foley Decl. ¶ 11. Thus, he declares that Peloton believed that there would be no likelihood of confusion if it used the name "Peloton" in connection with its products.

There is a triable issue as to whether Peloton adopted its PELOTON mark in good faith and without the intent to cause confusion. Therefore, this factor weighs against summary judgment on the Move Press Motion.

(8) <u>Expansion of Product Lines</u>

"Inasmuch as a trademark owner is afforded greater protection against competing goods, a 'strong possibility' that either party may expand his business to compete with the other will weigh in favor of finding that the present use is infringing. When goods are closely related, any expansion is likely to result in direct competition." *Sleekcraft*, 599 F.2d at 354.

Move Press argues that this factor weighs in its favor because the parties use the same mark for related goods. Because there is a triable issue of fact as to the relatedness of the goods, Move Press's position is unpersuasive. Although Peloton added the Peloton Tread to its product line and expanded the classes it offers, there is no evidence that Peloton has considered publishing a magazine. Foley Decl. ¶ 68. Similarly, there is no evidence that Move Press plans to offer home fitness products or virtual group fitness classes. As a result, in connection with the present motion, this factor is neutral as to likelihood of confusion. *See Hanginout, Inc. v. Google, Inc*., 54 F. Supp. 3d 1109, 1131 (S.D. Cal. 2014) (this factor was neutral where plaintiff failed to present any evidence that it planned to expand into defendant's services).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV18-01686 JAK (RAOx) | Date | September 5, 2019 |
|---|---|---|---|
| Title | Move Press, LLC v. Peloton Interactive, Inc. | | |

        c)        Overall Analysis of *Sleekcraft* Factors

Based on the foregoing, there are triable issues remain as to the likelihood of confusion resulting from Peloton's alleged infringing use of PELOTON. Because "summary judgment is generally disfavored in the trademark arena," *Interstellar*, 184 F.3d at 1109, the Move Press Motion is DENIED on the merits.

**IV.**    **Conclusion**

For the reasons stated in this Order, the Peloton Motion is **GRANTED**, and the Move Press Motion is **DENIED** as moot and on the merits. On or before September 19, 2019, following a meet and confer process as to the form of a proposed judgment, Peloton shall lodge a proposed judgment, stating whether its form is disputed by Move Press. If Move Press disputes the form, it shall timely file any objections in conformance with the Local Rules no later than September 26, 2019.

**IT IS SO ORDERED.**

                                                                                         :

Initials of Preparer    ak